In the Interest of D.G. and S.G.

No. 04–98–00795–CV.

Court of Appeals of Texas,
San Antonio.

Sept. 1, 1999.

Craig L. Leslie, Kerrville, Duke Hooten, Texas Dept. of Protective & Regulatory Services, Special Litigation Atty., Boerne, for Appellant.

Scott F. Monroe, Albert D. Pattillo, III, Kerrville, Gregory Richards, P.C., Kerrville, for Appellee.

Sitting: PHIL HARDBERGER, Chief Justice, ALMA L. LÓPEZ, Justice, KAREN ANGELINI, Justice.

## OPINION

Opinion by: ALMA L. LÓPEZ, Justice.

The Texas Department of Protective and Regulatory Services ("TDPRS") appeals a judgment denying TDPRS's petition to terminate the parental rights of the biological father of D.G. and S.G., Dewitt Garry ("Garry"). The judgment was rendered on a jury verdict that the parental rights should not be terminated. The sole issue presented is that the trial court erred in refusing to grant TDPRS's motion for new trial on the ground that the jury's failure to find that Garry's parental rights

to D.G. and S.G. should be terminated was so against the great weight and clear and convincing evidence as to be manifestly unjust. We affirm the trial court's judgment.

### FACTUAL AND PROCEDURAL HISTORY

Garry was indicted in January of 1994 of four counts of delivery of cocaine and one count of assault. Garry was in jail for about a month but was released on medical furlough for health problems, including problems with his pancreas, kidneys and liver which were caused by alcohol and drug use.

The biological mother of D.G. and S.G., Kendra Ester ("Ester"), admitted to drinking heavily while she was pregnant. Garry testified that he told Ester that her drinking was not good for the baby, but he never sought professional help for Ester. Garry admitted that he supplied Ester with cocaine during her pregnancy. Both D.G. and S.G. have been diagnosed with Prenatal Alcohol and Drug Exposure, and, as a result, each will experience different combinations of language, learning, and behavior problems.

TDPRS received a referral on Ester in August of 1994 for neglectful supervision. At that time, D.G. was approximately nine months old, and Ester was pregnant with S.G., who was born in December of 1994. The caseworker made an unannounced visit in September of 1994, and the referral was ruled out. In October of 1994, TDPRS received a referral on Ester for medical neglect of D.G., which was ruled "unable to determine."

In December of 1994, the case was referred to a family preservation worker, who developed a family plan. The plan was completed by the worker in January of 1995, but the plan was not signed by Garry and Ester until February 10, 1995. The plan required Ester to attend parenting classes and advised Garry to attend also. The plan required the family to allow a nurse homemaker to visit the home. The plan further required protective day care to be utilized by Garry and Ester to give them time away from the children to avoid feeling overwhelmed by them. Finally, the plan required Ester and Garry to obtain therapy through Treatment Associates.

Neither Ester nor Garry attended parenting classes. However, the nurse homemaker was allowed to visit the home. Protective day care was not utilized due to space constraints, but Garry and Ester did attempt to comply with this plan requirement. Neither Ester nor Garry obtained therapy through Treatment Associates.

The case was subsequently transferred to intensive family supervision. The caseworker visited with the family on March 8, 1995 and March 15, 1995. By her third visit, Garry had been sent to prison for the cocaine and assault offenses.

Each of the caseworkers that visited Garry and Ester during the time that Garry was out of prison testified that the children were well-fed and the house was well-maintained. The biggest concern expressed by the caseworkers was the alcohol and drug involvement and culture to which the children were being exposed. After Garry went to prison, in May of 1995, the children were taken into the emergency custody of TDPRS.

Garry was presented a second service plan in October of 1995. The plan's recommended long-range goal for permanency was placement with a relative. Garry signed the form and provided two potential relatives for placement, Ester's mother and grandmother. Studies were performed on both households, and both were subsequently rejected. TDPRS did not notify Garry of these rejections or request alternative names.

In December of 1996, Ester signed an affidavit relinquishing her parental rights. The proceeding to terminate Garry's rights was tried before a jury in June of 1998.

Both the representative of TDPRS and the guardian ad litem testified that termination was in the best interest of the child. Each testified that Garry's actions contributed to the children having Prenatal Alcohol and Drug Exposure which will adversely affect the children's lives. They further testified that the children need permanency that would not be available to them in the absence of a termination. The children's therapist described the lifelong problems the children will suffer and that they will need to be cared for by someone with an expanded support system due to these problems.

Garry testified that he had changed his life in prison and would no longer abuse drugs and alcohol. Garry stated that he had been approached with drugs while in prison and had declined. Garry had occasionally sent the children pamphlets, Bibles, and cards while in prison. He also made hand-painted handkerchiefs for the children with their pictures and the picture of himself and the children's half-brother. Garry stated that he was not seeking custody of his children but would like to obtain custody sometime in the future. Garry stated that he intended to participate in Victory Outreach when he received parole, which would assist him in locating suitable housing and a job. Garry testified that he would attend parenting classes and would work with the children's therapist. The children's therapist stated that he could teach a parent how to parent and would be willing to aid a parent who was given visitation rights with regard to the care of the children. The foster mother testified that if termination was denied, the children could remain with her in her home.

The jury found that the parent-child relationship between Garry and D.G. and S.G. should not be terminated. The trial court entered judgment based on the verdict. The trial court subsequently denied the motion for judgment notwithstanding the verdict and motion for new trial filed by TDPRS; however, the trial court encouraged TDPRS to appeal to this court.

## STANDARD OF REVIEW

■ The natural right existing between parents and their children is of constitutional dimensions. *Holick v. Smith,* 685 S.W.2d 18, 20 (Tex.1985). A termination decree is complete, final, irrevocable, and divests that natural right for all time. *Id.* For this reason, involuntary termination proceedings must be strictly scrutinized. *Id.; see also In re H.C.,* 942 S.W.2d 661, 662 (Tex.App.—San Antonio 1997, no writ).

■ The evidence in support of termination must be clear and convincing before a court may involuntarily terminate a parent's rights. TEX. FAM.CODE ANN. § 161.001 (Vernon 1996 & Supp.1999). This court has previously held that the intermediate standard of review of clear and convincing will be used when an appellant challenges the factual sufficiency of the evidence. *In re H.C.,* 942 S.W.2d at 663. This case presents a more unique situation in which TDPRS, the party with the burden of proof at trial, is appealing based on the jury's failure to find that Garry's rights should be terminated. In such a case, we, as a reviewing court, must "sustain the failure to find unless a review of all of the evidence demonstrates that a rational jury could have found only that it was highly probable that the fact existed." Justice Bill Vance, *The Clear and Convincing Evidence Standard in Texas: A Critique,* 48 BAYLOR L. REV. 391, 415 (1996). In reviewing the evidence, we may not reweigh the evidence to our own liking, and we may not second guess the jury's assessment of the credibility of the witnesses. *Mitchell v. Southern Pacific Transp. Co.,* 955 S.W.2d 300, 304 (Tex. App.—San Antonio 1997, no writ).

■ In order to terminate Garry's parental rights, TDPRS was required to establish by clear and convincing evidence (1) one of the statutory grounds for termination; and (2) that termination is in the children's best interest. TEX. FAM.CODE

ANN. § 161.001 (Vernon 1996 & Supp. 1999). One of the statutory grounds alleged by TDPRS was that Garry engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangered the physical and emotional well-being of the children. *See id.* The jury was not asked to address each of the requirements for termination separately; therefore, the jury could have believed that Garry engaged in conduct that endangered the physical and emotional well-being of the children in the past, but the jury could have found that termination was not in the children's best interest. We will assume for purposes of this opinion that the jury would have found that a statutory ground for termination existed. The evidence was undisputed that Garry was involved in drugs and alcohol and that he took at least one of the children to a bar frequented by drug and alcohol abusers. The evidence was further undisputed that Garry provided Ester with cocaine during her pregnancy. As a result, the children will suffer from lifelong emotional problems. Given the uncontroverted nature of this evidence, we agree with TDPRS that a rational jury could have found only that it was highly probable that Garry engaged in conduct that endangered the physical and emotional well-being of the children.

■ In evaluating whether termination would be in the best interest of the children, the jury was instructed to consider the following as factors:

(1) the desires of the children;

(2) the emotional and physical needs of the children now and in the future;

(3) any emotional and physical danger to the children now and in the future;

(4) the parenting ability of the individuals seeking custody;

(5) the programs available to assist those individuals to promote the best interest of the children;

(6) the plans for the children by those individuals or by the agency seeking custody;

(7) the stability of the home or proposed placement;

(8) the acts or omissions of the parent that may indicate that the existing parent-child relationship is not a proper one; and

(9) any excuse for the acts or omissions of the parent.

*See Holley v. Adams,* 544 S.W.2d 367, 372 (Tex.1976) (listing same factors set forth in jury charge).

The jury could have believed that the children were too young to have a stated desire with regard to their biological father. Although they only recognized their foster father as their "daddy," the jury could have found that the children could not understand the concept of termination of parental rights and its effect on their future.

The children's therapist, guardian ad litem, and caseworker testified to the children's need for permanency. However, the foster mother testified that the children could remain with her even if Garry's rights were not terminated, and Garry testified that he was not seeking custody at this time. Although Garry's plans for the future were somewhat ambiguous, he definitively intended to seek help from Victory Outreach and to maintain a relationship with his sons. The jury could have believed that Garry understood the dangers of his prior addiction and did not intend to return to that way of life.

Although Garry's drug use may have limited his parenting abilities in the past, he had taken parenting classes and stated he would continue to take such classes. The foster mother had sufficient training to handle the children's special needs at the present time. The children's therapist indicated that there were programs available to train Garry to become a better parent and to understand the special needs of his children.

If Garry's rights were terminated, the children would be placed with an adoptive family. If Garry's rights were not terminated, the children would remain in the custody of their foster parents, the trial court would control if and when Garry would be entitled to visitation, and TDPRS would work with Garry to develop a family plan upon his parole. While adoption may have provided a more permanent solution, the children's foster parents were providing a stable environment for the children.

Garry's past addiction demonstrated that the parent-child relationship was not a proper one in the past. However, the jury could have believed that Garry had changed his lifestyle and would not revert to his former drug use upon parole.

The jury was presented with testimony from which it could have believed that termination of Garry's parental rights was in the best interest of the children because of their need for permanency. The jury was also presented with testimony from which it could have believed that the children's foster parents were providing suitable stability for the children's existing needs. Garry was not seeking custody but was willing to work with TDPRS and others to address the special needs of his children. After reviewing all of the evidence presented and mindful of the fact that we may not reweigh that evidence or reassess the credibility of the witnesses, we cannot conclude that a rational jury could have found only that is was highly probable that termination was in the best interest of the children.

### Conclusion

The judgment of the trial court is affirmed.