In re J.H. and A.H., Minor Children






NUMBER 13-00-00677-CV

COURT OF APPEALS

THIRTEENTH DISTRICT OF TEXAS

CORPUS CHRISTI - EDINBURG

______________________________________________________________


IN RE J.H. AND A.H., MINOR CHILDREN.

______________________________________________________________


On appeal from the 105th District Court of Nueces County, Texas.

______________________________________________________________


O P I N I O N

Before Chief Justice Valdez and Justices Hinojosa and Castillo

Opinion by Justice Hinojosa


This is an appeal from the trial court's judgment notwithstanding the verdict which terminated the parental rights of
appellant, Calistro Joe Herrera. In a single issue, appellant contends the trial court erred in disregarding the jury's verdict
and in rendering a judgment terminating his parental rights to his two minor children, J.H. and A.H. In three cross-points,
appellee, Rachel Esquivel, contends: (1) the evidence conclusively established the statutory grounds for termination of
Herrera's parental rights, (2) the jury's verdict was so contrary to the overwhelming weight of the evidence as to be
manifestly unjust, and (3) even if the trial court erred in granting the judgment notwithstanding the verdict, it should still be
affirmed because appellee's motion for directed verdict should have been granted. We reverse and render.

A. Background


In 1986, Esquivel and Herrera began having an affair. At the time, Herrera was married and living with his wife and four
children. Esquivel was also married, but had not lived with her husband since 1984. (1) The relationship between Herrera
and Esquivel produced two children, J.H. and A.H. Herrera and Esquivel were never married, but they lived together from
1992 until 1998. 

On August 14, 1998, Herrera stabbed Esquivel over twenty times with a screwdriver. On July 27, 1999, Herrera signed a
judicial confession, and was convicted of the aggravated assault on Esquivel and sentenced to fifteen years imprisonment.

On May 20, 1999, Herrera was indicted for indecency with a child, an offense against his son, J.H. On July 27, 1999,
Herrera pleaded nolo contendere and was convicted and sentenced to fifteen years imprisonment. 

On September 7, 1999, Esquivel filed suit to terminate the parent-child relationship between Herrera and his children, J.H.
and A.H. Esquivel alleged that Herrera had: 

 


 knowingly placed or knowingly allowed the children to remain in conditions or surroundings that endanger the physical
or emotional well-being of the children;


 


 engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangers the physical
or emotional well-being of the children;


 


 been convicted for being criminally responsible for the serious injury of a child under section 21.11 of the Texas Penal
Code;


 


 been adjudicated under title 3 of the Texas Family Code for conduct that caused serious injury of a child and that would
constitute a violation of section 21.11 of the Texas Penal Code;


 


 knowingly engaged in criminal conduct that results in his imprisonment and inability to care for the children for not less
than two years from the date this petition is filed;



On May 4, 2000, Herrera filed a counterclaim seeking to terminate the parent-child relationship between the children and
Esquivel. Herrera alleged that Esquivel had:

 


 knowingly placed or knowingly allowed the children to remain in conditions or surroundings that endanger the physical
or emotional well-being of the children; and


 


 engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangers the physical
or emotional well-being of the children.


The case was tried to a jury on June 19, 2000. After hearing all the evidence, the jury decided to not terminate the
parent-child relationship of either Herrera or Esquivel. 

On June 23, 2000, Esquivel filed a motion for judgment notwithstanding the verdict. Esquivel alleged:

It was established conclusively through documentary evidence that Respondent, Calistro Joe Herrera, was convicted of
Indecency with a Child and sentenced to more than 2 years imprisonment. Also, through deposition testimony, a
psychologist testified that it would be in the [children's] best interest that the father's rights be terminated, and one child
testified that it was his desire to have his father's rights terminated.

There was conclusive evidence of the Respondent's violent conduct towards the [children's] mother in the [children's]
presence and testimony from the treating psychologist that the witnessing of that conduct has caused serious emotional
damage to the [children].

Herrera filed an objection to Esquivel's motion for judgment notwithstanding the verdict and a "Motion to Render
Judgment Not to Terminate the Rights of Calistro Joe Herrera" arguing that:

 


 The jury, the trier of fact reviewed all the evidence and deemed that the rights of CALISTRO JOE HERRERA should
not be terminated and thus the jury's decision should be upheld.


 


 Petitioner had two very capable attorneys assisting her along with the ad litem and still the evidence was not enough for
the jury to find that termination was in the best interests of the children.


 


 The evidence in the case was appropriately rebutted as not sufficient to terminate parental rights. The jury is not
required to terminate based on a conviction and they chose not to.


 


 The psychologist that testified was very unclear and in fact said, "I am not in the recommending business."



The trial court considered the motions on June 27, 2000. At the conclusion of the hearing, the trial court stated:

The Court finds that the evidence clearly and convincingly showed that the Respondent, Calistro Joe Herrera, had, prior to
the event stated in the petition and for which he was previously convicted and which brought us here for trial, that he has
been convicted for being criminally responsible for the serious injury of a child under Section 21.11 of the Texas Penal
Code; namely, the offense of indecency with a child. And further, that the Respondent, Calistro Joe Herrera, knowingly
engaged in criminal conduct that resulted in his conviction of an offense and imprisonment and inability to care for the
child or children for not less than two years from the date of the filing of the petition.

Based on those findings of fact, the Court finds that it is appropriate to terminate the parental rights of Calistro Joe Herrera
to the two children named in the petition. The Court will grant the motion of the Respondent - excuse me - the motion of
the Petitioner for a judgment notwithstanding the verdict, and I will direct Ms. DeLong to prepare the appropriate judgment
reciting those findings.

On June 30, 2000, the trial court signed an order granting Esquivel's motion for judgment notwithstanding the verdict. In
addition to the findings pronounced at the hearing, the court further found "that it is in the children's best interest for the
parent-child relationship between the Respondent and the children be terminated." In a separate order, the trial court
terminated the parent-child relationship between Herrera and the children, and denied Herrera's counterclaim to terminate
the parent-child relationship between Esquivel and the children. On July 31, 2000, Herrera filed a motion for new trial,
urging the court to reconsider the granting of Esquivel's motion for judgment notwithstanding the verdict. The court heard
the motion on September 11, 2000. After hearing argument, it denied the motion.

B. Standard of Review


A trial court may disregard a jury's findings and grant a motion for judgment notwithstanding the verdict only when there is
no evidence upon which the jury could have made its findings. Mancorp, Inc. v. Culpepper, 802 S.W.2d 226, 227 (Tex.
1990); Wal-Mart Stores, Inc. v. Hinojosa, 827 S.W.2d 43, 44 (Tex. App.-Corpus Christi 1992, no writ). In other words, a
trial court may render a judgment notwithstanding the verdict if a directed verdict would have been proper. Tex. R. Civ. P.
301; Fort Bend County Drainage Dist. v. Sbrusch, 818 S.W.2d 392, 394 (Tex. 1991).

In reviewing a judgment notwithstanding the jury's verdict, we determine whether there is any evidence upon which the
jury could have made its finding. Brown v. Bank of Galveston, N.A., 963 S.W.2d 511, 513 (Tex. 1998). We review the
record in the light most favorable to the jury's finding, considering only the evidence and inferences that support the finding
and rejecting the evidence and inferences contrary to the finding. Id. If there is more than a scintilla of competent evidence
to support the jury's finding, then the judgment notwithstanding the verdict will be reversed. Southern States Transp., Inc.
v. State, 774 S.W.2d 639, 640 (Tex. 1989). The evidence supporting a jury's finding amounts to more than a mere scintilla
if reasonable minds could arrive at the finding given the facts proved in the particular case. Burroughs Wellcome Co. v.
Crye, 907 S.W.2d 497, 499 (Tex. 1995). Appellate courts must consider the evidence and inferences as they tend to
support the jury's verdict and not with a view towards supporting the trial court's judgment. Mancorp, Inc., 802 S.W.2d at
227-28; Hinojosa, 827 S.W.2d at 45. If any evidence of probative force supports a contested issue, the judgment
notwithstanding the verdict was improperly granted. See Leitch v. Hornsby, 935 S.W.2d 114, 118 (Tex. 1996). Affirmance
of the trial court's judgment is proper if it is supported by any ground asserted in the motion for judgment notwithstanding
the verdict. Cf. Kelly v. Diocese of Corpus Christi, 832 S.W.2d 88, 90 (Tex. App.-Corpus Christi 1992, writ dism'd w.o.j.)
(reviewing directed verdict). 

The natural right existing between parents and their children is of federal constitutional dimensions. Santosky v. Kramer,
455 U.S. 745, 758-59 (1982) (holding the parent-child relationship is "far more precious than any property right"); Holick v.
Smith, 685 S.W.2d 18, 20 (Tex. 1985). The termination of parental rights is final and ends all legal ties between the parent
and child, except the child's right of inheritance. Tex. Fam. Code Ann. § 161.206(b) (Vernon 1996); Holick v. Smith, 685
S.W.2d 18, 20 (Tex. 1985). Because termination of parental rights is such a drastic remedy and is of such weight and
gravity, due process requires the petitioner to justify termination by a heightened burden of proof of "clear and convincing
evidence." Tex. Fam. Code Ann. § 161.001 (Vernon 1996); In re D.G. & S.G., 5 S.W.3d 769, 771 (Tex. App.-San
Antonio 1999, no pet.); In re A.D.E., 880 S.W.2d 241, 245 (Tex. App.-Corpus Christi 1994, no writ); Ybarra v. Tex. Dep't
of Human Serv., 869 S.W.2d 574, 576 (Tex. App.-Corpus Christi 1993, no writ). "Clear and convincing evidence" is an
intermediate standard, falling somewhere between the preponderance standard of ordinary civil proceedings and the
reasonable doubt standard of criminal proceedings. In re A.D.E., 880 S.W.2d at 245.

Texas courts of appeal are divided on whether the clear and convincing standard of proof required at trial to terminate
parental rights requires a stricter standard of appellate review. In re B.R., 950 S.W.2d 113, 117 (Tex. App.-El Paso 1997,
no writ); In re J.J., 911 S.W.2d 437, 439-40 (Tex. App.-Texarkana 1995, writ denied). This Court, however, has not
applied an elevated standard of review when examining the sufficiency of the evidence in parental termination cases. In re
A.D.E., 880 S.W.2d at 254; Doria v. Tex. Dep't of Human Res., 747 S.W.2d 953, 959 (Tex. App.-Corpus Christi 1988, no
writ).

C. Analysis


In his sole issue, Herrera contends the trial court erred in disregarding the jury's verdict and in rendering the judgment
notwithstanding the verdict which terminated his parental rights to J.H. and A.H. Herrera asserts that section 161.001 of
the Texas Family Code is a permissive statute which by its very terms does not obligate the trial court to grant termination
even if the statutory requirements for termination have been met, and a parent does not forfeit his parental rights merely
because he is incarcerated.

In order to terminate Herrera's parental rights, Esquivel was required to establish by clear and convincing evidence (1) one
of the statutory grounds for termination and (2) that termination is in the children's best interest. Tex. Fam. Code Ann. §
161.001 (Vernon Supp. 2001); Richardson v. Green, 677 S.W.2d 497, 499 (Tex. 1984). One of the statutory grounds
alleged by Esquivel was that Herrera had been convicted for being criminally responsible for the serious injury of a child
under section 21.11 of the Texas Penal Code (the offense of indecency with a child). Tex. Fam. Code Ann. § 161.001 (1)
(L) (iv) (Vernon Supp. 2001). We will assume for purposes of this opinion that the jury would have found that this
statutory ground for termination existed given the presentment into evidence of his July 27, 1999 conviction for the offense
of indecency with a child. 

In evaluating whether termination would be in the best interest of the children, the jury was instructed to consider the
following factors:

 


 the desires of the child or children, 


 


 the emotional and physical needs of the child now and in the future, 


 


 the emotional and physical danger to the child or children now and in the future, 


 


 the parental abilities of the individual seeking custody, 


 


 the programs available to assist these individuals to promote the best interest of the child or children,


 


 the plans for the child or children by these individuals seeking custody,


 


 the stability of the home, 


 


 the acts or omissions of the parents which may indicate the existing parent-child relationship is not a proper one, and 


 


 any excuse for the acts or omissions of the parents. 



See Holley v. Adams, 544 S.W.2d 367, 372 (Tex. 1976) (listing same factors set forth in jury charge).

In a videotaped deposition, J.H. testified concerning Herrera's inappropriate conduct:

 


 Could you please tell me what happened between you and your father the first part of the summer.


 


 When I was taking a shower, he walked in.


 


 And what happened?


 


 And he started looking at me.


 


 What do you mean looking at you?


 


 He was just looking.


 


 Okay. Did anything happen after that?


 


 Yes. He said, "What are you hiding under that towel?"


 


 What did you respond?


 


 I said, "Nothing."


 


 And then what did he do?


 


 He said, "You have nothing to hide."


 


 Did he at any time touch you?


 


 He tried to.


 


 Did he succeed?


 


 No.

 Has he ever touched you?


 


 Yes.


 


 When did that happen?


 


 When we went to go watch a movie.


 


 What was the movie, do you remember?


 


 Yes.


 


 What movie was it?


 


 Paulie.


 


 And when you say he touched you at that time, what happened at Paulie?


 


 At the end of the movie he said, "Let me see your Paulie."


 


 And what happened?


 


 And he tried to grab it.


 J.H. also testified about the aggravated assault Herrera committed against Esquivel when Herrera repeatedly stabbed
Esquivel with a screwdriver. J.H. witnessed the incident and he "grabbed [Herrera] and . . . started pulling him" to get
Herrera off his mother. He further testified that the incident made him scared, he has had trouble sleeping as a result, and
he now goes to therapy to cope with his problems. When asked if he wants any contact with Herrera, J.H. answered "No. . .
. Because I don't know how its going to turn out."

Rachel Sosas, coordinator of Youth Services at the Women's Shelter, testified about her conversations with J.H. and A.H. a
couple of days after the stabbing incident. The children discussed the stabbing, and when asked what it was like living in
the home with both parents, the children "talked about it being very chaotic, very - a lot of violence going on, very scary. . .
. They said that their mom had left and their dad had threatened to kill her because she left." When questioned concerning
their father, the children 

talked about being fondled and looked at in the shower by their dad. . . . [A.H.] was talking about how he was afraid of his
dad, and then he started talking about things that made him afraid of his dad. . . . He talked about how they had gone out of
town on a trip and were in a hotel-motel room. He was in bed with his dad and that his dad touched his genitalia on the
outside of his clothes. 



Rosas testified that during the six to eight weeks she counseled with the children, "[A.H.] talked about being afraid of his
dad being released from jail, and [J.H.] did say that he loved his dad." When asked if the children expressed a desire to be
with their father, Rosas said "[J.H.] did. [A.H.] did not."

Dr. De Socarraz, a psychologist, testified about his sessions with the children. He testified that the "crux of the problem
[with the children] has been the reported attack by the father of the mother that was two years ago, I believe, '98, and the
fact that the kids were witnesses and, in fact, at least [J.H.] was involved in trying to pull the father off the mother so they
were witnesses and involved in what occurred." In their sessions, the children "made mention of emotional abuse, physical
abuse, and sexual abuse" by the father against them. When asked about any alleged molestation, De Socarraz said that the
children "[hesitantly] talked about . . . being watched or observed in the bathroom and also touching. They feel very
uncomfortable with it." He also testified that the children were "afraid of being hurt by the father," and he did not "think
that it would benefit the children to be with him whatsoever." When questioned about the termination of Herrera's rights,
De Socarraz stated,

I did not say that I would terminate his rights. I said that it would be very traumatic for the kids to be with him. That
would not be therapeutic. It wouldn't be very helpful. It would be very destructive. That's as far as I want to go as a
psychologist either way. I'm not going to terminate somebody's rights. . . . What I recommend is that there is no contact
between the children and the father unless the children at some point desire such contact.



Esquivel testified that she had been physically abused by Herrera throughout the relationship. On the occasion when
Herrera stabbed her with a screwdriver, she sustained injuries to her face, head, neck, arms, back, ears, and eye. She lost
hearing in her left ear, her hands are weak as a result of having the screwdriver go through her hand, she is partially
paralyzed on the left side of her face, and she cannot see well out of one eye. Esquivel also testified that Herrera hit the
children on occasion. Herrera would hit or kick J.H. on the back or head, and hit A.H. hard on the behind or legs. When
Esquivel moved out of the apartment she shared with Herrera, prior to the stabbing incident, she left the children with
Herrera for about a month, 

because [she] was afraid to take them and then he would hurt all of [them], and at the time the boys were telling [her], [she]
would ask them questions because [she] would try - [she] would go and call them and see them a lot, and they would tell
[her] that he was being really nice and he was changing, and he was, you know, going to, you know, be better.



Herrera testified about his relationship with the children and Esquivel. He said that he never hit Esquivel, and explained
how he worked two jobs to provide for his children. He further testified that the allegations of indecency were

in retaliation to what happened between me and her. I never hurt my kids. I never touched them in an inappropriate way. I
love my kids very much and I want to be with my kids, but the kids, you can't teach a kid between right and wrong when
she doesn't know the difference between right and wrong, in my opinion. 



When asked whether A.H. believed he touched him inappropriately, Herrera responded, "No, sir, it was put in his mind by
the mother." When discussing his convictions, Herrera testified:

 


 If your appeals aren't successful, how long are you in jail, Mr. Herrera?


 


 Going to keep me there for 15 years.


 


 So what danger are you to these children right now?


 


 Nothing at all, sir.


 


 Let's assume for sake of argument that you've done everything they said. These kids are going to be 30 years old when
you get out of jail if you don't get out [sic], aren't they?


 


 Yes, sir.


 


 And yet you're still here fighting for rights that you may not get to exercise anyway?


 


 Yes, sir.


 


 Why?


 


 I love my children. I want to be with my children. I have been separated from them for 19 months because of what
happened there with her, and she has turned my kids against me by what she is doing. My kids, if somebody was to sit
down and talk with my kids and explain to them what is going through their minds about what is happening with her
about living there in the environment there where she is having a relationship with another woman, and my kids are
there sitting there listening to everything . . . . 


 


 Mr. Herrera, if you get out of jail, would you submit to any conditions that any court imposed on you as far as visiting
your children?


 


 Yes, sir.


 


 Would you go to parenting classes, anger management classes, whatever the Court deemed necessary?


 


 Yes.


 


 If you gave up your parental rights, would you not be responsible for the child support obligation you are currently
responsible for?


 


 Pardon me?


 


 If you gave up - you're currently, you currently have a child support obligation?


 


 Yes, sir.


 


 And you obviously aren't meeting that right now because you're incarcerated, correct?


 


 No, sir.


 


 But you intend to meet that at some point when you're able to, don't you?


 


 Yes, sir.


 


 And, in fact, had you given up your rights, you would have never had to pay another dime of child support, would you?


 


 Yes, sir.


 


 You wouldn't - you would not have had -


 


 If I gave my rights, I don't have to pay any more, but -


 


 And so -


 


 Money is not the issue. It's just the fact of the matter that my kids, I want to see my children raised up. I want to be with
my children. I love my children.


 


 If money is not the issue and you're paying the price, why, why are you here? Why are we making this jury sit through
this, the Judge, the lawyers? Why? You can't see these kids if you're in jail. Why are you doing this?


 


 Because I want to be with my children. I love my children that much. It doesn't matter if I'm incarcerated now. I'm
paying for what I have done. I want to see my children. I want to see them raised up there. I don't want to miss out. I
don't want my children growing up like that. I used to, I used to take them to church.


Herrera's ex-wife testified about her relationship with him. She said that Herrera never abused her, and never "beat,
abused, neglected, or abandoned" their four children. She further stated that Herrera has always provided for the family.

D. Conclusion


After reviewing the record in the light most favorable to the jury's finding, we conclude that more than a scintilla of
evidence exists by which the jury could determine that Herrera's parental rights should not be terminated. While it was
shown that Herrera has been convicted of the offenses of indecency with a child and aggravated assault, the jury could have
reasonably believed that terminating Herrera's parental rights was not in the best interest of the children.

The jury heard testimony from which it could have believed that termination of Herrera's parental rights was in the best
interest of the children because of the trauma and violence they have endured and witnessed while with Herrera. However,
the jury also heard testimony from which it could have believed (1) that Herrera loved and was loved by his children, (2)
that he was willing to seek counseling for his anger and other problems, and (3) given Herrera's fifteen year sentence, that
the children will be adults by the time he is released and therefore capable of deciding whether they want to see their father.
After reviewing all of the evidence presented and mindful of the fact that we may not reweigh that evidence or reassess the
credibility of the witnesses, we conclude that there is more than a scintilla of evidence to support the jury's finding that
Herrera's parental rights should not be terminated.

Accordingly, we hold the trial court reversibly erred by disregarding the jury's findings and by rendering judgment that
Herrera's parental rights be terminated notwithstanding the jury's verdict. Herrera's first issue is sustained and Esquivel's
three cross-points are overruled.

We reverse the trial court's judgment. In accordance with the jury's verdict, we render judgment that Calistro Joe Herrera's
parent-child relationship with J.H. and A.H. not be terminated and that Rachel Esquivel take nothing by her suit.



FEDERICO G. HINOJOSA

Justice



Do not publish. Tex. R. App. P. 47.3.



Opinion delivered and filed this the

24th day of January, 2002.

1. Esquivel married Emilio Soliz in 1984 and lived with him for two months.