# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-04-00284-CV

**Moses Hernandez, Appellant**

**v.**

**Texas Department of Protective and Regulatory Services, Appellee**

---

**FROM THE DISTRICT COURT OF MCCULLOCH COUNTY, 198TH JUDICIAL DISTRICT
NO. 2002009, HONORABLE ROBERT HOFFMANN, ASSOCIATE JUDGE PRESIDING**

---

## M E M O R A N D U M   O P I N I O N

Moses Hernandez appeals a final decree terminating his parental rights to three children, M.H., M.A.H., and A.L.H.  *See* Tex. Fam. Code Ann. § 161.001(1), (2) (West 2002).  On appeal, he argues that the evidence is insufficient to support the statutory termination grounds on which the trial court relied.  Hernandez, who was incarcerated at the time of trial, also complains that the trial court acted improperly in proceeding in his absence, that he was not properly served, and that various inconsistencies between the filings in the Clerk's Record and corresponding documents introduced into evidence at trial demonstrate that his due process rights were violated.  We affirm the final decree.

**BACKGROUND**

M.H., M.A.H., and A.L.H. are the children of Hernandez and Christi Marie Silva. Although Silva was still married to another man, she and Hernandez had a romantic relationship for an approximately seven-year period ending in 2002. Although the pair often lived together, their relationship was frequently interrupted by periods in which Hernandez was incarcerated. Silva later estimated that Hernandez was behind bars for as much as six months out of each year of their relationship.

M.H. was born in November 1997, M.A.H. in March 1999, and A.L.H. in January 2000. In December 2001, during one of Hernandez's periods of incarceration, Silva left the three younger children at the house of her mother, Laura Aguilar, in Brady. Aguilar had previously gained custody of three older children whom Silva had conceived with her estranged husband. Aguilar eventually called the Department on January 30, 2002, explaining that she could not care for the additional three children and expressing concern regarding their welfare with Silva and Hernandez. The Department took emergency custody of M.H., M.A.H., and A.L.H. and placed them in foster care.

In February 2002, following a hearing, the district court entered a temporary order appointing the Department temporary sole managing conservator, granting Silva and Hernandez (who was then out of jail) limited supervised visitation rights, and mandating that each parent meet certain requirements as a condition for possible reunification. Hernandez's conditions included undergoing psychological or psychiatric evaluation; completing counseling, parenting classes, and substance abuse assessments and any recommended treatment; and complying with the Department's

2

family service plan and any amendments thereto. In early March, the Department and Hernandez agreed to a family service plan whereby he would obtain full-time employment and safe housing, stay away from firearms, and attend scheduled visitations with the children.[1] The trial court approved this plan by order following a hearing later that month.

In April 2002, Hernandez was incarcerated again after an incident in which he assaulted Silva and gave her a black eye. After Hernandez was arrested for the assault, law enforcement officials discovered several outstanding state and federal arrest warrants. From April 2002 through the time of trial, Hernandez remained incarcerated in various state and federal penal institutions. In October 2002, the trial court appointed an attorney ad litem for Hernandez, who filed a general denial on his behalf. An additional family service plan regarding Hernandez, similar to the prior version, was filed at this time.

In February 2003, the trial court entered an agreed final order appointing the Department as permanent sole managing conservator and granting Silva and Hernandez limited supervised visitation rights. The order expressly reserved the Department's right to seek termination of Silva and Hernandez's parental rights without the need to prove change in circumstances and to utilize evidence predating the order in support for such an action. After having explored various relative placements, the Department placed the children with their maternal great-aunt and great-

_____

[1] As discussed below, the copy of the March 2002 family service plan in the Clerk's Record is signed by Hernandez, but the copy introduced into evidence at trial and included in the Reporter's Record is not signed by Hernandez.

3

uncle, Belinda and Johnny Culp. The Culps have cared for the children since February 2003 and have expressed a desire to adopt them.

In August 2003, the Department filed a new petition seeking termination of Silva and Hernandez's parental rights to enable the Culps to adopt the children. At an October hearing, the trial court set the case for bench trial in February 2004. Hernandez was represented at this hearing by his attorney ad litem, Stephen Harpold. Although Hernandez had not requested to be bench warranted for trial, the trial court *sua sponte* addressed the issue of whether or how Hernandez would participate in trial. The trial court determined that Hernandez's physical presence at trial was not essential to protect his rights and that his rights could be adequately protected (1) through Harpold's representation and (2) by allowing Hernandez, with Harpold's assistance, to prepare an affidavit containing the testimony he would have offered at trial. *See In re Z.L.T.*, 124 S.W.3d 163, 165 (Tex. 2003).

The trial court also ordered the case to mediation in advance of trial. During the mediation, Harpold understood that Hernandez would agree to an order terminating his parental rights. Following the mediation, however, Hernandez refused to communicate with Harpold despite numerous attempts to contact him by phone or mail. Harpold ultimately resorted to attempting to contact Hernandez through Hernandez's prison counselor. The counselor advised Harpold that Hernandez would neither sign the termination agreement nor speak to Harpold or anyone else regarding the case. Harpold continued attempting, without success, to contact Hernandez until trial.

On the date of trial, Harpold moved for a continuance and to withdraw, citing his inability to communicate with Hernandez and either to obtain an agreed order or to prepare an

affidavit for trial. The trial court denied these motions and proceeded to hear evidence. Silva voluntarily relinquished her parental rights and testified at length that it was in the children's best interest that her own and Hernandez's rights to the children be terminated so that the Culps could adopt them. In particular, Silva testified that:

- Hernandez rarely worked and that the only money he ever had was what his father gave him.

- Hernandez used drugs while he lived with Silva and the children, that she witnessed him intoxicated in front of the children, and that he smoked marijuana in the presence of the children.

- Hernandez had a violent temper and he "routinely" blew up at her in front of the children. She described one incident in which he, while under the influence of drugs, pulled her hair and threw her across a room in the presence of the children.

- Hernandez had quarreled with her over money she needed for clothes and shoes for M.H. because he was starting HeadStart. Hernandez reacted by grabbing M.H. and leaving with him without Silva's permission.

- Later, M.A.H., A.L.H., and another of Silva's boyfriends were all waiting in a car outside a convenience store while Silva was inside using the restroom. Hernandez approached on the driver's side and punched the boyfriend in the face, grabbed M.A.H. out of the back of the car and took her with him. Hernandez kept M.H. and M.A.H. away from Silva for two months until the place he was staying with the children was "busted" and Silva was able to retrieve them.

One of the children's caseworkers, Linda Scalf, testified that Hernandez admitted to her that he was "involved with people who use drugs." When they were removed, both M.H. and M.A.H. reportedly asked the shelter staff and the foster mother for a "cold beer." M.H. told them

that he and his sisters were allowed to drink beer and smoke cigarettes, but that marijuana was only for grown ups.[2]

In her investigation, Scalf said she learned that Hernandez "kept weapons and had threatened people with weapons in the past." Scalf testified that the children indicated to her several times that they were scared of Hernandez and did not want to be returned to Silva and Hernandez. Scalf explained that after removal the children demonstrated deviant behavior consistent with abuse and neglect. She said that M.H. displayed angry outbursts, aggression towards his sisters, bed wetting, aggression towards adults, and aggression towards his mother during her visits. The children had nightmares and woke up expressing fears that Hernandez was coming after them.

All three children acted out sexually. The foster mother found M.H. and M.A.H. in bed together simulating a sex act. M.H. told the foster mother that they were having sex. M.H. told his therapist that he witnessed Hernandez having sex with Silva and with other women; he also said he saw Silva having sex with other men. He was able to describe the various sex acts that he witnessed. M.H. was also able to describe the events of an arrest by the police. He described incidents when Hernandez hurt Silva in front of him.

All of the children described a chaotic, unstable lifestyle with their parents, having to move from house to house and being left with numerous babysitters. M.H. also described being

---

[2] On appeal, Hernandez suggests that it was improper for the trial court to admit testimony recounting statements made by the children to caseworkers, therapists, and foster parents after their removal. But these out-of-court statements were admitted without objection. *See* Tex. R. Evid. 802 ("Inadmissible hearsay admitted without objection shall not be denied probative value merely because it is hearsay.").

hungry and having to sleep in a car that did not run. The children reportedly improved dramatically in the custody of the Culps and were thriving. Scalf testified that the children showed immediate improvement when placed in a safe, stable environment.

Scalf also testified about Hernandez's failure to comply with the court's conditions for reunification. Scalf testified that both she and the court explained to Hernandez the importance of satisfying these requirements within a certain time frame in order to have the children returned to him. Scalf said that she spent one and a half to two hours explaining these requirements to Hernandez on the day of the February 2002 hearing. She advised him that the Department would pay for all the court-ordered services. To make it convenient for him, Scalf scheduled all of Hernandez's court-ordered services in Brownwood, where he was living at the time. Scalf provided Hernandez with the name, address, and telephone numbers for the appropriate mental health professionals and told him to make arrangements for both the psychological evaluation and individual counseling.

Nonetheless, between the time of the court's order in February 2002 and his arrest in April, Hernandez failed to comply with any of the conditions for reunification—he did not submit to a psychological evaluation or to a substance abuse assessment, and he did not attend counseling, parenting classes, or anger management classes. He had obtained a job but held it for only a few weeks. Hernandez attended only one scheduled visit with his children in March 2002. He failed to attend a status hearing for the children held on March 21. Scalf testified that Hernandez did not accomplish even one of the requirements.

Scalf detailed her efforts to assist Hernandez in satisfying the requirements. She said she always notified him of hearings and appointments in letters and would enclose stamped, self-addressed envelopes so that he could communicate with her and the children more easily. She sent him photos of the children, as well as updated information about them. Hernandez sent the children three or four letters and drawings by way of Scalf. However, he stopped corresponding to the children a full year before trial. After Hernandez was incarcerated, Scalf continued to maintain contact with him at the various penal facilities where he was placed. Scalf testified that she made reasonable efforts to work with Hernandez towards reuniting with his children. She said that Hernandez did not show actions consistent with his expressed desire to take care of his children.

The trial court terminated Hernandez's parental rights. It expressly found, by clear and convincing evidence, that the Department had established statutory termination grounds and that termination would be in the children's best interests. *See* Tex. Fam. Code Ann. § 161.001(1), (2). This appeal followed.

## DISCUSSION

On appeal, Hernandez presents seven issues, alleging that the trial court lacked personal jurisdiction because he had not been properly served with citation, that his due process rights were violated because the trial court failed to issue a bench warrant and held the termination trial in his absence, that the existence of discrepancies in the record demonstrates that his due process rights were violated, and that there is legally and factually insufficient evidence to support the statutory grounds for termination.

**Proof of service**

In his first issue, Hernandez asserts that the trial court lacked personal jurisdiction over him, alleging that the record contains no proof that he was properly served with citation upon the filing of the Department's current (August 2003) petition seeking termination. Although the record as originally forwarded to this Court apparently did not include this information, the Department supplemented the record upon discovering the omission. *See* Tex. R. App. P. 34.5(c). The record before us contains a copy of the petition and citation issued on September 25, 2003, and executed on Hernandez on October 10, 2003, in Pollock, Louisiana, the location of the federal prison where he was incarcerated. The record thus demonstrated that the trial court had acquired personal jurisdiction over Hernandez before it signed its judgment in March 2004. We overrule Hernandez's first issue.

**Bench warrant**

In his second issue, Hernandez complains that the trial court did not issue a bench warrant to enable him to attend trial and proceeded without him being present. Hernandez does not dispute that he never requested to be bench warranted back to Brady for trial. Rather, he attacks the trial court's *sua sponte* application of the *Z.L.T.* factors, *see* 124 S.W.3d 163,165 (Tex. 2003),[3] and

---

[3] Although inmates cannot be denied access to the courts simply because they are incarcerated, they do not have an absolute right to appear in person in every court proceeding. Rather, courts must balance an inmate's right of access to the courts against the efficacy of the correctional system. *See In re Z.L.T.*, 124 S.W.3d 163, 165 (Tex. 2003). A variety of factors are considered in making this assessment, including: (1) the cost and inconvenience of transporting the prisoner to the courtroom; (2) the security risk to the court and public posed by the inmate; (3) whether the prisoner's claims are substantial; (4) whether resolution of the litigation can reasonably be delayed until the inmate's release; (5) whether the inmate can and will offer admissible,

determination that his presence at trial was not essential to protect his rights and that his rights could be adequately protected by allowing him to participate by affidavit.

Hernandez's failure to request to be bench warranted is fatal to his complaint. In *Z.L.T.*, the supreme court held that trial courts do not have a duty to independently examine the record and weigh the relevant factors when an inmate requests a bench warrant but fails to explain why he or she is entitled to attend trial. 124 S.W.3d at 166. Instead, an inmate, like any other litigant, has the burden to identify with sufficient specificity the grounds for the ruling he seeks. *Id*. at 166 ("since a prisoner has no absolute right to be present in a civil action, it follows that the prisoner requesting a bench warrant must justify the need for his presence"); *see also* Tex. R. Civ. P. 21; Tex. R. App. P. 33.1(a)(1)(A). Here, Hernandez did even less than the inmate in *Z.L.T.*: he did not make a request to the trial court that he be allowed to attend trial.[4] We overrule Hernandez's second issue.[5]

---

noncumulative testimony that cannot be presented by deposition, telephone, or some other means; (6) whether the inmate's presence will facilitate judging of his or her demeanor or credibility; (7) whether trial is to the court or a jury; and (8) the inmate's probability of success on the merits. *Id*. at 165-66.

[4] Moreover, Hernandez brings forward nothing that might lead us to conclude that the trial court abused its discretion in determining that Hernandez's physical presence at trial was not essential to protect his rights.

[5] Hernandez briefly states, in the last sentence of his argument regarding his second issue, that the trial court "abused its discretion in denying the defendant the right to be present at trial and *by denying the motion for continuance*." (Emphasis added.) This statement appears in the context of an argument regarding the eighth element of the *Z.L.T.* test, potential for delay. Hernandez makes no other mention of his motion for continuance, nor does he provide argument, legal authorities, or record cites to support his sole assertion. Hernandez has thus waived any complaint regarding the trial court's denial of his motion for continuance. *See* Tex. R. App. P. 38.1(h); *Trenholm v. Radcliff*, 646 S.W.2d 927, 934 (Tex. 1983).

**Sufficiency of the evidence**

In issues three through six, Hernandez challenges the sufficiency of the evidence to support the trial court's findings that Hernandez committed acts and omissions constituting statutory termination grounds under subsections (D), (E), (N) and (O) of family code section 161.001(1).[6] The court was authorized to terminate Hernandez's parental rights if the Department proved and the court found, by clear and convincing evidence, (1) that Hernandez engaged in conduct constituting a statutory ground for termination and (2) that termination was in the children's best interests. *See* Tex. Fam. Code Ann. § 161.001 (West 2002); *In re C.H.*, 89 S.W.3d 17, 23 (Tex. 2002). Although the trial court found several statutory grounds for termination, the Department was required to establish only one to satisfy the first element of the termination standard. *Green v. Texas Dep't of Protective & Regulatory Servs.*, 25 S.W.3d 213, 219 (Tex. App.—El Paso 2000, no pet.); *In re J.M.T.*, 39 S.W.3d 234, 237 (Tex. App.—Waco 1999, no pet.); *In re D.G.*, 5 S.W.3d 769, 771 (Tex. App.—San Antonio 1999, no pet.). Moreover, Hernandez has not challenged the trial court's finding regarding the second element of the termination test, that termination was in the best interest of the children. Accordingly, to affirm we need only determine that there is sufficient evidence to support one of the termination grounds found by the trial court.

---

[6] Hernandez does not specify whether he is challenging the legal or factual sufficiency of the evidence, or both. We will assume he is challenging both the legal and factual sufficiency of the evidence.

*Standard of review*

To terminate parental rights, the Department must make its required showings by clear and convincing evidence. "Clear and convincing" evidence is that degree of proof which will produce in the mind of the trier of fact a firm belief or conviction in the truth of the proposition sought to be established. Tex. Fam. Code Ann. § 101.007 (West 2002). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations" supporting termination. *C.H.*, 89 S.W.3d at 23 (quoting *State v. Addington*, 588 S.W.2d 569, 570 (Tex. 1979)).

In reviewing the legal sufficiency of the evidence under the clear and convincing standard, we consider all of the evidence in the light most favorable to the finding and determine whether a reasonable trier of fact could have formed a firm belief or conviction that the finding was true. *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). We review the factual sufficiency of the evidence under the clear and convincing standard by viewing all of the evidence and determining whether a reasonable fact-finder could have resolved disputed evidence in favor of its finding. *Id.* If the disputed evidence is such that a reasonable fact-finder could have formed a firm belief as to the truth of the Department's allegations, the evidence is factually sufficient. *Id.*; *C.H.*, 89 S.W.3d at 25. These standards of review maintain the appropriate deference to the fact-finder's role by assuming that it resolved evidentiary conflicts in favor of its finding when it was reasonable to do so and by disregarding evidence that it could have disbelieved. *J.F.C.*, 96 S.W.3d at 266-67.

*Endangerment*

In issues three and four, Hernandez challenges the sufficiency of the evidence supporting the trial court's findings that he knowingly placed or allowed his children to remain in conditions or surroundings that endangered their well-being or knowingly allowed his children to remain with persons who engaged in conduct that endangered his children. *See* Tex. Fam. Code Ann. § 161.001(1)(D), (E). To prove endangerment under subsection D, the Department had to prove that Hernandez (1) knowingly (2) placed or allowed the children to remain (3) in conditions or surroundings that endangered their physical or emotional well-being. *Id*. § 161.001(1)(D).[7] Under subsection E, the Department had to prove that Hernandez (1) engaged in conduct or knowingly placed the children with persons who engaged in conduct (2) which endangered their physical or emotional well-being. *Id*. § 161.001(1)(E). Under subsection D, the danger to the child results from the child's environment, while under subsection E, the parent's conduct is the source of the danger to the child. *In re D.C.*, 128 S.W.3d 707, 715 (Tex. App.—Fort Worth 2004, no pet.); *Robinson v. Texas Dep't of Protective & Regulatory Servs.*, 89 S.W.3d 679, 686 (Tex. App.—Houston [1st Dist.] 2002, no pet.).

---

[7] The degree of endangerment required for involuntary termination is "more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment," but the child does not need to suffer actual physical injury. *In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996); *Texas Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). Instead, "endanger" means to "expose to loss or injury; to jeopardize." *Boyd*, 727 S.W.2d at 533. Moreover, the parent need not have actual knowledge of an injury or certain knowledge that an injury to the child will result; it is enough that the parent is aware of the potential danger to the child and the parent disregards the risk. *In re S.G.S.*, 130 S.W.3d 223, 238 (Tex. App.—Beaumont 2004, no pet.).

A parent's failure to maintain a home and constantly moving and changing locations may constitute conduct that endangers a child's well-being. *See In re S.G.S.*, 130 S.W.3d 223, 238 (Tex. App.—Beaumont 2004, no pet.). Stability and permanence are paramount in the upbringing of children. *See In re T.D.C.*, 91 S.W.3d 865, 873 (Tex. App.—Fort Worth 2002, pet. denied); *In re M.A.N.M.*, 75 S.W.3d 73, 77 (Tex. App.—San Antonio 2002, no pet.); *Salas v. Texas Dep't of Protective & Regulatory Servs.*, 71 S.W.3d 783, 792 (Tex. App.—El Paso 2002, no pet.); *see Lehman v. Lycoming County Children's Servs. Agency*, 458 U.S. 502, 513 (1982) (children need stable, long-term relationships with caretakers). A fact-finder may infer from past conduct endangering the well-being of a child that similar conduct will recur if the child is returned to the parent. *See In re D.L.N.*, 958 S.W.2d 934, 941 (Tex. App.—Waco 1997, no pet.).

Furthermore, a parent's repeated criminal acts may constitute sufficient evidence of conduct that endangers the well-being of a child. *In re J.N.R.*, 982 S.W.2d 137, 143 (Tex. App.—Houston [1st Dist.] 1998, no pet.), *disapproved on other grounds by C.H.*, 89 S.W.3d at 24-25; *see also In re A.W.T.*, 61 S.W.3d 87, 89 (Tex. App.—Amarillo 2001, no pet.); *Allred v. Harris County Child Welfare Unit*, 615 S.W.2d 803, 806 (Tex. App.—Houston [1st Dist.] 1980, writ ref'd n.r.e.). Illegal drug use in the child's household constitutes surroundings that endanger the well-being of the child under subsection D. *D.C.*, 128 S.W.3d at 715-16; *In re S.D.*, 980 S.W.2d 758, 763 S.W.3d 707, 715 (Tex. App.—San Antonio 1998, pet. denied). Violent or abusive conduct by someone within the household also constitutes an environment that endangers children. *K.A.S.*, 131 S.W.3d 215, 222 (Tex. App.—Fort Worth 2004, pet. denied); *D.C.*, 128 S.W.3d at 715; *Director of Dallas County Child Protective Servs. Unit v. Bowling*, 833 S.W.2d 730, 733 (Tex. App.—Dallas

1992, no writ); *In re B.R.*, 822 S.W.2d 103, 106 (Tex. App.—Tyler 1991, writ denied); *Ziegler v. Tarrant County Child Welfare Unit*, 680 S.W.2d 674, 678-79 (Tex. App.—Fort Worth 1984, writ ref'd n.r.e.).

The evidence at trial, summarized above, overwhelmingly demonstrated that Hernandez failed to provide his children with a safe and stable environment. Hernandez subjected the children to a chaotic and virtually nomadic lifestyle. By all accounts, he had a violent temper and routinely screamed at Silva. He was physically violent towards Silva in the presence of the children. The children also witnessed his alcohol and drug abuse; the adverse impact on the children was demonstrated when the four-year-old attempted to order a cold beer at the emergency shelter and by M.H.'s statements concerning the appropriateness of alcohol use by children. Evidence in the record also supports the claim that Hernandez engaged in sexual activity in front of the children that had an adverse affect on their psycho-social development. Hernandez also persisted in criminal conduct that resulted in incarcerations that prevented him from properly supervising the children; his criminal conduct continued even after the children were removed and his parental rights were at stake. The evidence in this case constitutes clear and convincing proof that Hernandez knowingly placed his children in harmful circumstances and engaged in conduct that endangered their physical and emotional well-being. *See* Tex. Fam. Code Ann. § 161.001(1)(D), (E). We overrule Hernandez's third and fourth issues.[8]

---

[8] We have no need to address Hernandez's fifth and sixth issues, in which he attacks the trial court's findings under subsections (N) and (O) because the evidence is sufficient to support at least one of the termination grounds. *See Robinson*, 89 S.W.3d at 687; *In re S.F.*, 32 S.W.3d 318, 320 (Tex. App.—San Antonio 2000, no pet.) (only one ground need be proved under section 161.001(1) to support judgment of termination).

**Due process**

In his seventh issue, Hernandez argues that he was deprived of his rights to due process under the Fifth and Fourteenth Amendments by what he alleges to have been the Department's use of falsified or inaccurate documentary evidence at trial. He bases this complaint on apparent inconsistencies between three of the Department's trial exhibits, PX1, PX2, and PX4, and corresponding documents in the clerk's record.

PX1 is a certified copy of the February 2002 temporary order setting forth conditions for Silva and Hernandez to be reunified with the children. PX1 and its counterpart in the clerk's record differ with regard to the recitation concerning whether Hernandez attended the adversary hearing that preceded the order. Although the clerk's record version recites that Hernandez "is incarcerated and did not appear in person," PX1 contains handwritten alternations reflecting that Hernandez "~~is incarcerated and~~ did ~~not~~ appear in person." PX1 is consistent with the trial testimony of Department caseworkers that Hernandez did, in fact, attend this hearing.

PX4 is a certified copy of the March order approving the family service plan. The inconsistencies between PX4 and its counterpart in the Clerk's Record are similar to those involving PX1: PX4 contains handwritten modifications reflecting that Hernandez "~~did~~/did not appear in person" at a March 21, 2002 hearing, but the corresponding document in the clerk's record does not indicate whether or not Hernandez appeared. Trial testimony reflected that, consistent with PX4, Hernandez did not attend this hearing, although he had notice and was not incarcerated.

16

PX2 is a certified copy of the March 2002 family service plan. PX2 does not contain Hernandez's signature, but the corresponding document in the clerk's record does contain Hernandez's signature.

Hernandez's counsel did not object to the admission of any of the challenged exhibits at trial. In order to complain on appeal about the admission of evidence, an appellant must have made a timely objection in the trial court specifying the grounds for the objection, otherwise error is waived. *See* Tex. R. Evid. 103(a)(1); Tex. R. App. P. 33.1; *Bushnell v. Dean*, 803 S.W.2d 711, 712 (Tex. 1991); *In re C.Q.T.M.*, 25 S.W.3d 730, 733 (Tex. App.—Waco 2000, pet. denied). Error in the admission of evidence cannot be raised for the first time on appeal. Tex. R. App. P. 33.1; *Bushnell*, 803 S.W.2d at 712.

Moreover, Hernandez has not demonstrated how the discrepancies in these exhibits prejudiced him. He does not suggest that there are other inaccuracies in the documentary evidence in this case. He argues only that the failure of the Department to "offer accurate copies" in trial or the "failure of the clerk to maintain accurate copies of court record would seem to invoke issues of due process and fundamental fairness in the proceeding before the court." Based on this equivocal suggestion, he asks this Court to hold that he was denied due process. He cites no authority for his position.

We hold that any discrepancies were not material to the judgment and that any error in their admission was harmless. We overrule Hernandez's seventh issue.

17

## CONCLUSION

Having overruled Hernandez's first, second, third, fourth, and seventh issues on appeal, we have no need to consider his fifth or sixth issues.  We affirm the decree of termination.

_____

Bob Pemberton, Justice

Before Justices B. A. Smith, Puryear and Pemberton

Affirmed

Filed:  March 10, 2005