# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-06-00004-CV

**Jose Luis Gonzalez, Sr., Appellant**

**v.**

**Texas Department of Family and Protective Services, Appellee**

**FROM THE DISTRICT COURT OF TOM GREEN COUNTY, 119TH JUDICIAL DISTRICT
NO. B-04-0061-CPS, HONORABLE THOMAS J. GOSSETT, JUDGE PRESIDING**

## M E M O R A N D U M   O P I N I O N

Jose Luis Gonzalez, Sr. appeals from the district court's decree terminating his parental rights to O.M.G., M.L.G., and J.L.G. and appointing appellee the Texas Department of Family and Protective Services as the children's permanent managing conservator. Appellant challenges the legal and factual sufficiency of the evidence supporting the district court's findings that (1) he constructively abandoned his children; and (2) termination of the parent-child relationship was in the children's best interest. We conclude that the record contains legally and factually sufficient evidence and affirm the district court's decree.

## BACKGROUND

Appellant is the biological father of three children who are the subject of this appeal: O.M.G., born in 1991; M.L.G., born in 1994; and J.L.G., born in 1998. Appellant's children have had an unstable home environment for several years. In 2000, they were removed from their mother,

Elizabeth Ann Gonzalez, because of her drug abuse. When the children were removed from their mother, appellant had already begun serving a four-year sentence for his 1997 offense of driving while intoxicated (DWI). Appellant suggested that the children be placed with their paternal grandparents, and they were awarded permanent managing conservatorship in 2001. In January 2004, O.M.G., M.L.G., and J.L.G. were removed from their grandparents for issues related to nonsupervision and physical and emotional abuse, and the Department was named temporary managing conservator. Since being removed from their grandparents, the children have been in at least four separate foster care placements.

Appellant was released from prison in November 2001 and remained free until October 2, 2003, when he was incarcerated for burglary of a building. He was still incarcerated for the burglary offense when O.M.G., M.L.G., and J.L.G. were removed from their grandparents in 2004. Later that year, upon his release from jail, he was seized by the United States Immigration and Naturalization Service (INS). INS held appellant for ten days before deporting him to Matamoros, Mexico. When he attempted to re-enter the United States the following week, he was incarcerated for illegal entry. Appellant remained in the custody of immigration authorities on July 1, 2005, the date of his final hearing on termination of parental rights.

Appellant's children were thirteen, eleven, and seven years old when the final hearing was held, and they had been in the conservatorship of the Department for well over six months. As of the date of the hearing, appellant had not resided with his two older children for eight years; he had never resided with his youngest child, J.L.G.; and he had not seen any of his children in almost two years.

2

At the hearing, appellant professed his belief that the INS was mistaken about his status. He testified that he was a resident alien with a "green card" and expressed hope of being released soon. Appellant thought he might learn more about his status on July 27, when he expected to go to court for a determination about his ability to stay in the United States. If released from detention and allowed to stay, appellant stated that he planned to work as a sheep shearer, find a house in Eden or San Angelo, and try to get his children back. Even if he were deported, appellant testified that he was "pretty sure" he would be able to have contact with his children.

Appellant understood that the Department was requesting that the court terminate his parental rights. He stated that the court should not do so "[b]ecause everybody makes mistakes and I did mine and I just want to come back and get out and try to win the love of my kids back and take care of them, give them a house and whatever they need." He further stated, "[O]n my record it's just DWIs and I don't think I have done so bad, you know, so I think I would need a chance to get my kids."

The court considered appellant's testimony in its summary of the evidence and noted certain positive factors—that appellant was present at the hearing and that appellant testified about his love for the children. But it also noted that appellant had been incarcerated for an extended period of time since September 1997 and that his youngest child could not know him because the child was born in 1998, while appellant was in custody. Because of appellant's incarceration, the court declined to find that appellant intentionally abandoned his children, failed to comply with a court order (for psychiatric/psychological evaluation, counseling, parenting classes, etc.), or failed to support his children: "that's kind of setting him up to fail and I certainly am not going to do that."

3

However, considering the consequences of appellant's conduct, the court found that appellant had constructively abandoned the children. The court reasoned that the children "have not had a father for all intents and purposes since 1997" and stated that it had "no reason to believe that [appellant] will not continue to be deported given his felony records."

At the conclusion of the hearing, the court terminated appellant's parental rights, finding that appellant had constructively abandoned O.M.G., M.L.G., and J.L.G. and that termination was in the best interest of the children.[1] On December 6, 2005, the court signed and entered a final decree terminating appellant's parental rights and incorporating the July 1, 2005 findings announced from the bench. This appeal followed.

## ANALYSIS

### *Standard of review*

To terminate an individual's parental rights to his child, the Texas Department of Family and Protective Services must prove and the trial court must find by clear and convincing evidence both of the following statutory requirements: (1) that the parent has engaged in one of the statutory grounds for termination; and (2) that termination is in the child's best interest. Tex. Fam. Code Ann. § 161.001 (West Supp. 2007); *In re C.H.*, 89 S.W.3d 17, 23 (Tex. 2002). The clear-and-convincing burden of proof has been defined as "that measure or degree of proof which will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *In re C.H.*, 89 S.W.3d at 23 (quoting *State v. Addington*,

---

[1] The court also heard evidence at the hearing with regard to Elizabeth Ann Gonzalez and terminated her parental rights to the children. She is not a party to this appeal.

4

588 S.W.2d 569, 570 (Tex. 1979)). Thus, in reviewing termination findings, this Court must determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the State's allegations. *Id.* at 25.

Decisions from Texas courts show great respect for the biological bond between parent and child, recognizing "that the natural right which exists between parents and their children is one of constitutional dimensions." *In re J.W.T.*, 872 S.W.2d 189, 194-95 (Tex. 1994) (quoting *Wiley v. Spratlan*, 543 S.W.2d 349, 352 (Tex. 1976)). However, the Texas Supreme Court has also recognized that "the rights of natural parents are not absolute; protection of the child is paramount." *Id.* The child's emotional and physical interests must not be sacrificed merely to preserve parental rights. *In re C.H.*, 89 S.W.3d at 26.

In a legal sufficiency review, termination findings are given appropriate deference by the reviewing court. *See In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002); *Smith v. Texas Dep't of Protective & Regulatory Servs.*, 160 S.W.3d 673, 679 (Tex. App.—Austin 2005, no pet.). In such cases, the reviewing court must consider all the evidence in the light most favorable to the findings to determine whether the factfinder could reasonably have formed a firm belief or conviction that its findings were true. *In re J.F.C.*, 96 S.W.3d at 266. The appellate court must assume that the factfinder resolved disputed facts in favor of the finding if a reasonable factfinder could do so and disregard evidence that the factfinder may have reasonably disbelieved or whose credibility may reasonably be doubted. *Id.* However, the court may not disregard all evidence contrary to the finding—it must consider facts that are undisputed. *Id.*

5

In a factual sufficiency review, conversely, termination findings are not considered in the light most favorable to the findings and the reviewing court may not disregard evidence that the factfinder may have reasonably disbelieved. *See id.* The inquiry in a factual sufficiency review is "whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the State's allegations." *Id*. Appellate courts should consider whether disputed evidence is such that a reasonable factfinder could not have resolved that disputed evidence in favor of its finding. *Id*. If, in weighing the disputed evidence, the factfinder could have reasonably resolved the conflicts to form a firm conviction that the State's allegations concerning the grounds for termination were true, then the evidence is factually sufficient and the termination findings must be upheld. *In re C.H.*, 89 S.W.3d at 18-19; *see also In re J.F.C.*, 96 S.W.3d at 266.

***Timeliness of appeal***

As a preliminary matter, the Department contends that appellant's issues are not preserved because he failed to comply with the provision of the family code requiring the filing of a statement of points on appeal within fifteen days after the court enters its final order. *See* Tex. Fam. Code Ann. § 263.405(b)(2) (West Supp. 2007). The court entered its final decree terminating appellant's parental rights on December 6, 2005. Accordingly, appellant's statement of points on appeal was due December 21, 2005. *See id.* The Department notes that appellant filed his "Statement of Points on which Jose Luis Gonzalez, Sr. Intends to Appeal the Final Decree Terminating Parental Rights" on December 22, 2005. The file stamp on appellant's statement of points in the record shows that it was filed on December 22, 2005 at 9:50 a.m.

6

However, the record also reflects that appellant's statement of points was accompanied by his attorney's signed certificate of service, indicating that the document was served on all counsel and filed with his notice of appeal on December 21, 2005. *See* Tex. R. Civ. P. 21 (requiring counsel to file pleadings with court clerk, serve copies on all other parties "at the same time" and to certify compliance with this rule by counsel's signature on the filed pleading). The Department offered nothing to contest the December 21, 2005 date in the certificate of service. In the interest of justice, we will consider both of appellant's issues on appeal.

**Sufficiency of evidence regarding constructive abandonment**

In his first issue, appellant contends that the evidence was legally and factually insufficient to support the district court's finding that he had constructively abandoned O.M.G., M.L.G., and J.L.G. Before the parent-child relationship may be terminated for constructive abandonment, the family code requires clear and convincing evidence that:

- the child has been in the custody of the Department for at least six months;

- the Department has made reasonable efforts to return the child to the parent;

- the parent has not regularly visited or maintained significant contact with the child; and

- the parent has demonstrated an inability to provide the child with a safe environment.

Tex. Fam. Code Ann. § 161.001(1)(N) (West Supp. 2007). We will review the evidence with regard to each of these factors.

7

### 1. Department custody for six months

Susan Neal, a Department caseworker, testified at the termination hearing that O.M.G., M.L.G., and J.L.G. had been in the conservatorship of the Department for seventeen-and-a-half months. Neal noted that her calculation was "not counting the prior case back in 2000-2001," when the children were taken from their mother and placed with their paternal grandparents. Appellant did not object to this testimony or present evidence contesting it. On appeal, he does not dispute that his children were in the custody of the Department for over six months.

### 2. Reasonable efforts to return children

Brunessia Adams, another Department caseworker, affirmed that she is responsible for working with parents of children who have been removed from their home in an effort to reunify the family, if that can be done safely. She testified that appellant was presented with a family service plan in 2000 and in 2004 that was designed to reunify him with the children. *See In re K.M.B.*, 91 S.W.3d 18, 25 (Tex. App.—Fort Worth 2002, no pet.); *see also In re E.A.W.S.*, No. 02-06-00031-CV, 2006 Tex. App. LEXIS 10515, at *61 (Tex. App.—Fort Worth Dec. 7, 2006, pet. denied) (mem. op.) (noting that reasonable efforts to reunite parent and child can be satisfied through preparation and administration of service plans). Both required appellant to complete an alcohol and drug abuse assessment, individual counseling, and participate in classes for parenting and anger management. Adams noted that appellant was unable to complete the required tasks because he was incarcerated, but she stated that he could have started the tasks upon his release. Adams visited appellant monthly while he was incarcerated. During that time, she assisted appellant

8

by arranging for his psychological evaluation.[2] She testified that appellant failed to notify her when he was released from jail in 2001, which prevented her from initiating any other services for him. Appellant did not object to this testimony or present evidence contesting it. On appeal, he does not dispute that the Department made reasonable efforts to return his children to him.

### 3. Lack of regular visits or significant contact

Appellant obtained a bench warrant to attend the termination hearing. He admitted that he was incarcerated when his youngest child was born, he had never lived with his youngest child, and he had not resided with his older children since 1997. He explained that he was incarcerated for DWI in 1997, released from prison in November 2001, and remained free until October 2, 2003, when he "took the blame for something that got stolen" and was incarcerated for burglary of a building.[3] In 2004, the INS took him from jail, held him for ten days, and deported him. He was apprehended upon his attempt to re-enter the United States the following week and remained in INS custody on the day of the termination hearing in 2005.

When asked about what attempts he had made when he was not incarcerated—from November 2001 until October 2003—to get custody of his children, appellant stated that he talked to his father about getting the children in May 2003. But because he broke his hand on May 4, 2003, and was unable to work for three months, he allowed the children to remain where they were placed.

---

[2] Appellant's psychological evaluation commenced but was incomplete because appellant was at his county work site when the psychologist made follow-up visits to the jail.

[3] Appellant denied committing any other offenses and denied any arrests or charges for assault or family violence.

Shortly after he was able to work again, he was incarcerated for burglary. Appellant testified that the last time he had talked to any of his three children or picked them up from his father's house for a visit was before his burglary incarceration in September 2003. Appellant testified that he tried to contact the Department in February or March 2005, "because he really wanted to find out where [his] kids were," but all his calls were collect and unsuccessful.

Appellant called Eva Mitchell, housekeeping department supervisor for the county, to testify on his behalf. She stated that appellant was a good-hearted, hard-working person whom she met through his work as a trustee. After appellant left, he sent letters to Mitchell "several different times" and she accepted his collect telephone calls. Mitchell also wired $50 to him in Mexico and wrote a letter of recommendation for him. Mitchell admitted, however, that she had only heard appellant talk about his children; she had never actually seen him with them.

By his own testimony, appellant was not incarcerated from November 2001 until October 2, 2003. During that time, he was unable to identify any attempt that he made to get custody of his children. Although appellant testified that he conversed with his children by telephone while they were in his parents' custody and that he picked them up to visit, the record does not reflect that those calls or visits constituted significant contact with the children. After he was deported in 2004, appellant corresponded several times with his friend Mitchell and placed telephone calls to her. He did not make the same effort to communicate with his children. *See In re D.S.A.*, 113 S.W.3d 567, 574 (Tex. App.—Amarillo 2003, no pet.) (noting that even incarcerated parent could pursue significant relationship with offspring through correspondence). Appellant made only two attempts to contact the Department about his children's whereabouts and those attempts did not occur until

2005. Caseworker Adams testified that appellant had minimal involvement in his children's lives during the three-to-five years preceding the hearing and that the children have very little attachment to him. The undisputed evidence is that appellant has had no contact with the children since 2003.

### 4. *Safe environment for children*

Caseworker Adams opined that, based on appellant's noncompliance with his service plan and his continued involvement with criminal activity, appellant was unable to provide his children with a safe or stable home environment or to provide for them financially. She stated that appellant's financial support for the children from August 2001 to June 2005 was reflected in records from the Texas Attorney General's office (showing a total of $354.73).

Appellant responded that he was unable to comply with his service plan because he was incarcerated. He stated that the work he performed during his incarceration was unpaid. Additionally, he asserted that the financial support records provided to the court excluded unspecified amounts of money he had given to his wife and parents. He stated that before he was first incarcerated, he gave his wife enough money to live "for about three years." He also stated that he gave money to his parents weekly or when he saw them between 2001 and 2003, when they were caring for the children. Appellant also provided a box of clothing for the children that was donated by employees of the Tom Green County Voters' Registration department, where he was working during his incarceration. Nevertheless, appellant admitted that he had not provided any money for the children since 2004. He further admitted that his ability to stay in the United States remained uncertain. His testimony about his employment and housing plans was similarly speculative.

11

Margaret "Molly" Taylor, the elections administrator of Tom Green County, testified that she had known appellant since 1983 and more recently, as a trustee working in her office. She described him as a polite, trustworthy, and hard working person who regretted his past difficulties and was eager to improve his life and be with his children. She prepared a letter of recommendation for appellant, opining in the letter that appellant had been a good parent. On cross-examination, she admitted that she had no knowledge of whether appellant had ever provided his children with a good home or supported them financially.

Cookie Guajardo, another person acquainted with appellant through his work at the county office, testified that while appellant was incarcerated in Pearsall, he called her to request a letter of recommendation. She thought that her letter was in reference to appellant's immigration matter, and the letter does not evaluate appellant as a parent. Guajardo testified that appellant is determined to succeed and prove that he "could be a good parent." She recalled that appellant once spoke of his children needing clothing, so she and another co-worker collected items for his children. She testified that she had, at times, sent appellant money and that since his return she had kept in communication with him.

Considering this record's evidence of constructive abandonment in the light most favorable to the ruling, we find that a reasonable factfinder could have formed a firm belief or conviction that the Department had custody of the children for more than six months and made reasonable efforts to return the children, and that appellant did not have regular visits or significant contact with the children and did not demonstrate an ability to provide a safe environment for them. *See In re J.F.C.*, 96 S.W.3d at 265-66. While imprisonment of a parent, standing alone, should not

12

constitute abandonment of a child as a matter of law, neither should it preclude a finding of abandonment. *Jordan v. Hancock*, 508 S.W.2d 878, 881 (Tex. Civ. App.—Houston [14th Dist.] 1974, no writ). Here, appellant's incarceration was not the cause of his failure to notify the Department about his release (which further prevented fulfillment of his service plan), his failure to sustain communication with his children, or his continued involvement in criminal activity after his release from prison. Accordingly, the evidence is legally sufficient to support the district court's finding that appellant constructively abandoned his children.

Furthermore, considering the evidence in the record in a neutral light, both for and against the finding of constructive abandonment, the evidence is factually sufficient because it is such that the district court could have reasonably resolved any disputes in the evidence to form a firm belief or conviction that appellant constructively abandoned his children. *See In re C.H.*, 89 S.W.3d at 18-19. Appellant does not dispute that the Department had custody of the children for more than six months and that it made reasonable efforts to return his children to him.

With regard to the significant-contact factor of constructive abandonment, the district court heard evidence that appellant had no communication with O.M.G., M.L.G., and J.L.G. since 2003, and that he made no attempt—when he was not incarcerated—to gain custody of his children or to sustain communication with them (as he managed to do with his friends). Appellant countered with his testimony that he called and "picked up" the children while they were in his parents' custody between 2001 and 2003. We conclude that, after weighing the disputed evidence, the district court could have reasonably formed a firm conviction about the truth of the Department's allegation concerning appellant's failure to regularly visit or maintain significant contact with the children.

13

Similarly, with regard to the safe-environment factor of constructive abandonment, the court heard evidence that appellant continued his involvement in criminal activity, had not supported his children since 2004, had speculative housing plans, was unemployed, and had a questionable ability to stay in the United States. Appellant responded with his testimony that he gave an unspecified amount of money to his wife for the children before his 1997 incarceration, that he gave an unspecified amount of cash to his parents for the children between 2001 and 2003, and that he provided a box of donated clothing for the children. Appellant also offered testimony from character witnesses who had no knowledge of his ability to provide a good home for the children, financially support them, or provide for their needs independent of charitable donations. We conclude that, after weighing the disputed evidence, the district court could have reasonably formed a firm conviction about the truth of the Department's allegation concerning appellant's demonstrated inability to provide the children with a safe environment.

We hold that there is legally and factually sufficient evidence in this record supporting the district court's finding that appellant constructively abandoned O.M.G., M.L.G., and J.L.G. *See* Tex. Fam. Code Ann. § 161.001(1)(N). Appellant's first issue is overruled.

The Department has demonstrated by clear and convincing evidence that appellant constructively abandoned his children, one of the statutory grounds for termination. We now consider the sufficiency of the evidence supporting the district court's finding that termination of appellant's parental rights was in the children's best interest. *See id*. § 161.001(2); *In re C.H.*, 89 S.W.3d at 23.

**Sufficiency of evidence regarding children's best interest**

In his second issue, appellant argues that the evidence introduced at trial was legally and factually insufficient to support a finding that termination of his parental rights was in the best interest of O.M.G., M.L.G., and J.L.G. There is a strong presumption that a child's interest is best served by preserving the conservatorship of the parents; however, clear and convincing evidence to the contrary may overcome the presumption. *Williams v. Williams*, 150 S.W.3d 436, 451 (Tex. App.—Austin 2004, no pet.). In deciding whether termination would be in the best interest of the child, the trial court may consider this nonexclusive list of factors: (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals to promote the best interest of the child; (6) the plans for the child by these individuals or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976); *In re D.G.*, 5 S.W.3d 769, 772 (Tex. App.—San Antonio 1999, no pet.). It is unnecessary to prove all of these factors as a condition precedent to parental termination. *In re C.H.*, 89 S.W.3d at 27. The evidence in this record shows some overlap with regard to the *Holley* factors.

### *Desires of the children and stability of proposed placement*

Caseworker Adams testified that since February 15, 2005, the children's needs have been met through their foster-adopt parents, Alvaro and Esmeralda Trejo. The Trejos are appellant's

15

friends and have known the children since they were small. Adams stated that the children "love it there" and that appellant suggested the placement with the Trejo family.[4] She also testified about the children's disinterest in visiting appellant. According to Adams, the Department had been unable to locate any appropriate relatives with whom the children might be placed and if appellant's parental rights were not terminated, the children would remain in foster care until the age of eighteen. Adams opined that foster care would not be in the children's best interest because they have told her that they want a permanent home and a mom and dad who are able to provide a stable and safe home environment. She recalled that when she visited appellant, he seemed interested in the children. But she also stated that appellant had demonstrated an inability to stop his criminal activity, maintain employment to provide and care for the children financially, meet their physical needs, or provide a safe and stable home. She recommended allowing the children to "move on with their lives" through the termination of appellant's parental rights.

Foster parent Esmeralda Trejo testified that O.M.G., M.L.G., and J.L.G. expressed their interest in having the Trejos adopt them and that the children had told the Trejos that they "wanted to live with [them]" even before they were removed from their grandparents. According to Trejo, the children said that "they are happy with us, they want to stay with us, they want us to be their parents, and they also agreed that they want to change their last names [to Trejo]." She testified that the other two children in the Trejo family are happy with their three would-be siblings: "They all get along together. They take care of each other." Trejo testified that O.M.G., M.L.G., and J.L.G.

---

[4] Appellant denied suggesting the Trejos as a potential adoption family for his children. He intended for the Trejos to hold the children for him until he "got out" and could get them back. However, he testified that he understood his children wanted to stay with the Trejos.

16

call her "[m]om or mommy" and they call her husband "[d]ad or daddy." She opined that allowing the children to be adopted, and to remain in her home until then, would be in their best interest. She also stated that she would be willing to have the children continue living in her home, even if she were unable to adopt them.

Del Fustos, the children's guardian ad litem with Court Appointed Special Advocates (CASA), testified that he had visited the children on many occasions. He recognized that returning the children to the family is "primary," but based on his investigation in this case, "[t]here is no family, there never has been a family, and there ain't never going to be a family . . . ." Fustos opined that the children had "essentially raised themselves," that they wanted to be adopted by the Trejos, and that they did not want anything to do with their biological family. He stated that being a parent does not "give you the right to everything, without love, stability, discipline, continuity in their lives and giving them [] guidance . . . ." He "highly recommend[ed]" termination of parental rights as being in the best interest of the children.

Sherri Balentine Tipton, the children's attorney ad litem, testified that she had visited with all three of the children and felt "strongly" that termination of parental rights was in the best interest of the children "so they can finally have a stable home."

### *Plans for the children and available programs*

The Department's plan for the children, according to Adams, would be to proceed with the adoption by the Trejos. Upon adoption, O.M.G., M.L.G., and J.L.G. would each qualify for an adoption subsidy and a college tuition waiver. They would also receive post-adoption services, including counseling and Medicaid, until the age of eighteen. Adams noted that those

17

subsidies and financial incentives are unavailable in private adoptions that do not occur through the Department.

Appellant testified about his plans for the children. If released from detention and allowed to stay in the United States, he planned to work as a sheep shearer, find a house in Eden or San Angelo, and try to get his children back. He testified that he had made mistakes, but his record was "just DWIs" and because he had not done so badly, he should have "a chance to get [his] kids." Appellant was "pretty sure" he would be able to have contact with his children, even if he were deported, and he hoped that the next court hearing would determine his ability to stay in the United States. He testified that he loved his children, wanted them to stay together, and wanted what was best for them. He agreed that he wanted his children to be happy, healthy, and cared for properly.

Our review of the record shows that O.M.G., M.L.G., and J.L.G. have not expressed any interest in being reunited with appellant. Rather, they have expressed their wish to remain with their foster parents, the Trejos, and be adopted by them. Adoption by the foster parents means a stable home for the children. With the Trejos, the children have their emotional and physical needs met, they attend counseling, and have steady provision for their necessities. They will also be entitled to several subsidies and programs upon adoption. At the time of the termination hearing, appellant had not seen or communicated with any of his children for two years and he was unsure whether he would be deported again. He also lacked employment and a place to live. After viewing the evidence in the light most favorable to the court's finding, we conclude that the district court could have reasonably formed a firm belief or conviction that termination of appellant's parental

18

rights was in the children's best interest. *See In re J.F.C.*, 96 S.W.3d at 265-66. Therefore, the evidence is legally sufficient to support the decree of termination.

Additionally, we note that the only evidence disputing the best interest finding was provided by appellant and Molly Taylor's recommendation letter. Taylor's letter opined that appellant "ha[d] been a good parent to his children" and that "they really need him, especially now." But at the hearing, she conceded that she had no knowledge of whether appellant had ever provided his children with a good home or supported them financially. Appellant asserted that he could "constructively" provide for his children, even if he were incarcerated or deported. He suggested that the court allow him to retain possessory conservatorship and continue the children's placement with the Trejos temporarily. There was no evidence, besides appellant's suggestion, that would support temporary placement of the children and significant evidence indicating that a permanent home with the Trejos was in the children's best interest. After considering the evidence for and against the best-interest finding in a neutral light, we conclude that it is factually sufficient because it is such that the district court could have reasonably resolved any disputes in the evidence to form a firm belief or conviction that termination of appellant's parental rights was in the children's best interest. *See In re C.H.*, 89 S.W.3d at 18-19; *see also In re J.F.C.*, 96 S.W.3d at 266. Therefore, the evidence is factually sufficient to support the decree of termination.

We hold that there is legally and factually sufficient evidence in this record supporting the district court's finding that termination of appellant's parental rights to O.M.G., M.L.G., and J.L.G. was in the children's best interest. *See* Tex. Fam. Code Ann. § 161.001(2). Appellant's second issue is overruled.

19

## CONCLUSION

Having overruled both of appellant's issues, we affirm the district court's decree.

_____

W. Kenneth Law, Chief Justice

Before Chief Justice Law, Justices Patterson and Pemberton

Affirmed

Filed:   June 5, 2008