# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

NO. 03-06-00239-CV

Lori Carpenter, Appellant

v.

Texas Department of Family and Protective Services, Appellee

FROM THE DISTRICT COURT OF BELL COUNTY, 146TH JUDICIAL DISTRICT
NO. 211,683-B, HONORABLE RICK MORRIS, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Lori Carpenter appeals the trial court's decree terminating her parental rights to her child, W.C. In her sole issue, she argues that the evidence is factually insufficient to support the court's findings in the decree. We affirm.

## BACKGROUND

Appellant was W.C.'s primary caregiver. The Department sought to terminate appellant's parental rights to W.C., a two-year old, after he sustained an unexplained blunt-force trauma that fractured his skull and caused a blood clot in his brain (subdural hematoma), requiring an emergency craniotomy and evacuation of the clot. Appellant has an extensive history with the Department.[1] She had W.C. removed from her for the first time in 2003, when he was one day old.[2]

---

[1] Appellant's parental rights to two other children, D.L.C. and D.A.C., were terminated. *See e.g., Taylor v. Texas Dep't of Protective & Regulatory Servs.*, 160 S.W.3d 641, 644

The Department returned W.C. to appellant the following year. Three months after W.C. was returned to appellant, the Department received a neglectful supervision complaint based on a neighbor's observation of W.C.'s multiple new facial bruises and a cast on his arm. The Department investigated, and a caseworker questioned appellant about W.C.'s injuries. Appellant stated that he had broken his left arm after falling down a flight of stairs. According to hospital records of treatment related to that fall, W.C. also sustained a skull fracture on the left side of his head and a thoracic spinal compression fracture. Appellant told the caseworker that W.C. was injured again two and a half weeks after his fall down the stairs when he fell out of his crib. The Department removed W.C. from appellant, but returned him to her six months later after his injuries were determined to be accidental.[3]

Within months of being returned to appellant the second time, W.C. sustained the head injury that is the subject of the Department's underlying action. Appellant gave an account of the events preceding W.C.'s trip to the emergency room in a medical history to the hospital.[4] She recalled that while brushing W.C.'s hair that morning, he began "screaming very intensely" when

---

(Tex. App.—Austin 2005, pet. denied) (appeal from termination proceedings involving D.A.C.). As the court noted during the final hearing, the Department did not plead prior terminations as a ground for seeking termination of appellant's parental rights to W.C.

[2] The record reflects that W.C. was removed from appellant because of her transient status, her apparent lack of ability to care for a child, and her previous history with the Department.

[3] Appellant told hospital staff that she forgot to raise the bar on W.C.'s crib. However, a hospital doctor noted that the location of some of the bruising on W.C.'s body was "quite inconsistent with him falling out of a crib."

[4] Invoking her constitutional right against self-incrimination under the Fifth Amendment, appellant never testified about the incident.

she touched a "soft spot" or "bump" on the right side of his head, above his ear. She denied knowing how it got there. She noted that W.C. "would not stop crying" when she tried to leave him at day care, and the day care staff informed her that he had been running a low-grade fever the previous week. Appellant took W.C. to the hospital, according to medical records, because he had a fever and was pulling on his ear. When hospital staff asked specifically about recent falls or injuries, appellant responded that W.C. had fallen at day care two weeks earlier. However, a progress note completed by a doctor in the pediatric intensive care unit states that the history of a fall at day care two weeks ago is "inconsistent [with W.C.'s] injuries" and an "investigation [is] in progress." A progress note by Dr. Richard Bonner states that the injuries are "highly suspicious for NAT" (defined in the hospital records as "non-accidental trauma").

The Department was notified that W.C. had been admitted to the hospital for a subdural hematoma and right parietal fracture with a five millimeter midline shift to the brain. His injury was attributed to blunt-force trauma. After receiving this report, the Department filed suit, alleging an immediate danger to W.C.'s physical health or safety and seeking termination of appellant's parental rights and/or appointment as W.C.'s temporary managing conservator.

The court signed an order for protection of a child in an emergency that named the Department as W.C.'s temporary managing conservator and ordered that W.C. be placed in substitute care until the court held a hearing. The order also appointed an attorney ad litem and guardian ad litem for W.C. and scheduled a hearing date. After a show cause hearing, the court appointed the Department as W.C.'s temporary managing conservator for 180 days. During a subsequent status-review hearing, the court approved a family service plan, prohibited appellant

from having any contact with W.C., and scheduled a permanency hearing. At that hearing, the court approved a permanency plan and permanency progress report submitted by the Department and scheduled a final hearing.

The final hearing was held on three separate days. During the final hearing and on its own motion, the court took judicial notice of "the file and proceedings" in four other cases brought before the same court: Cause Number 198,319, In the Interest of W.G.C. (involving the removal of W.C. from appellant one day after he was born for risk of abuse/neglect); Cause Number 207,529-B, In the Interest of D.P. (involving the removal of W.C.'s half-sibling from appellant for risk of abuse after W.C. fell down a flight of stairs and sustained a skull fracture and thoracic spinal compression fracture); Cause Number 190,582, In the Interest of Lori Carpenter (not in record); and Cause Number 190,112-B, In the Interest of D.C. (involving the removal of W.C.'s half-sibling, D.A.C., from appellant).[5]

At the conclusion of the final hearing, the court terminated appellant's parental rights, finding that (1) appellant had knowingly placed or knowingly allowed W.C. to remain in conditions or surroundings which endangered the child's physical or emotional well-being, (2) appellant engaged in conduct or knowingly placed W.C. with persons who engaged in conduct which endangered the child's physical or emotional well-being, and (3) termination of appellant's parental rights was in W.C.'s best interest. *See* Tex. Fam. Code Ann. § 161.001(1)(D), (E), (2) (West Supp. 2008). The district court signed a decree of termination that adopted the associate

---

[5] The court also took judicial notice of this Court's opinion in that case. *See Taylor*, 160 S.W.3d 641.

4

judge's proposed order and findings. Appellant filed an unsuccessful motion for new trial, and this appeal followed.

## ANALYSIS

### *Standard of review*

To terminate an individual's parental rights to his child, the Texas Department of Family and Protective Services must prove and the trial court must find by clear and convincing evidence both of the following statutory requirements: (1) that the parent has engaged in one of the statutory grounds for termination; and (2) that termination is in the child's best interest. Tex. Fam. Code Ann. § 161.001 (West Supp. 2008); *In re C.H.*, 89 S.W.3d 17, 23 (Tex. 2002). When evaluating the factual sufficiency of evidence supporting termination, an appellate court must consider "whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the State's allegations." *In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007) (quoting *In re C.H.*, 89 S.W.3d at 25).

In a factual sufficiency review, termination findings are considered in a neutral light and the reviewing court must give due consideration to evidence that the factfinder could reasonably have found to be clear and convincing. *See In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). Appellate courts should consider whether disputed evidence is such that a reasonable factfinder could not have resolved that disputed evidence in favor of its finding. *Id.* If, in weighing the disputed evidence, the factfinder could have reasonably resolved the conflicts to form a firm conviction that the State's allegations concerning the grounds for termination were true, then the evidence is factually sufficient

5

and the termination findings must be upheld. *In re C.H.*, 89 S.W.3d at 18-19; *see also In re J.F.C.*, 96 S.W.3d at 266.

Decisions from Texas courts show great respect for the biological bond between parent and child, recognizing "that the natural right which exists between parents and their children is one of constitutional dimensions." *In re J.W.T.*, 872 S.W.2d 189, 194-95 (Tex. 1994) (quoting *Wiley v. Spratlan*, 543 S.W.2d 349, 352 (Tex. 1976)). However, the Texas Supreme Court has also recognized that "the rights of natural parents are not absolute; protection of the child is paramount." *Id*. The child's emotional and physical interests must not be sacrificed merely to preserve parental rights. *In re C.H.*, 89 S.W.3d at 26.

**Trial court's findings**

Here, the trial court found that the Department had proven by clear and convincing evidence that appellant "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endangers the physical or emotional well-being of the child" and that appellant "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." *See* Tex. Fam. Code Ann. § 161.001(1)(D), (E). The trial court also found that the termination of appellant's parental rights was in the best interest of W.C. *See id.* § 161.001(2).

The Department concedes that, with regard to the first finding, the evidence was factually insufficient to support the termination of appellant's parental rights based on her knowingly placing or knowingly allowing the child to remain in conditions or surroundings which endangered the physical or emotional well-being of the child. *See id.* § 161.001(1)(D). Accordingly,

6

we consider only the factual sufficiency of the court's latter two findings: that appellant engaged in conduct or knowingly placed W.C. with persons who engaged in conduct that endangered W.C.'s physical or emotional well-being and that termination of appellant's parental rights was in W.C.'s best interest. *See id.* § 161.001(1)(E), (2).

**Factual sufficiency of endangerment finding**

Appellant challenges the factual sufficiency of the evidence supporting the trial court's finding that appellant engaged in conduct or knowingly placed W.C. with persons who engaged in conduct that endangered W.C.'s physical or emotional well-being. *See id.* § 161.001(1)(E). "Endanger" means "to expose to loss or injury; to jeopardize." *In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996) (quoting *Texas Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987)). The Texas Supreme Court has clarified that although "'endanger' means more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment, it is not necessary that the conduct be directed at the child or that the child actually suffers injury." *Id*.

The cause of the endangerment under subsection 161.001(1)(E) must be the parent's conduct, evidenced not only by the parent's acts but also by the parent's omissions. *In re C.M.B.*, 204 S.W.3d 886, 895 (Tex. App.—Dallas 2006, pet. denied); *In re S.H.A.*, 728 S.W.2d 73, 85 (Tex. App.—Dallas 1987, writ ref'd n.r.e.) (defining "conduct" under subsection (E) to include evidence of behavior that results in gross neglect of child); *see Phillips v. Texas Dep't of Protective & Regulatory Servs.*, 25 S.W.3d 348, 354 (Tex. App.—Austin 2000, no pet.) (holding that parent's failure to act endangered children); *Melton v. Dallas County Child Welfare Unit*, 602 S.W.2d 119,

7

120-21 (Tex. Civ. App.—Dallas 1980, no writ) (noting that although there was no showing of mother's affirmative mistreatment of her children, she never provided them with stable home life and frequently left their care to others without adequate provision for their welfare). Conduct that subjects a child to a life of uncertainty and instability endangers the child's physical and emotional well-being. *In re S.D.*, 980 S.W.2d 758, 763 (Tex. App.—San Antonio 1998, pet. denied).

The court heard evidence about the events preceding the discovery of W.C.'s injury from his grandmother, Melody Schilling, and others who lived in her home: her husband, Michael Schilling; her nephew, Christopher Luedke; and her son, Jimmy Parker, who was also appellant's boyfriend. Mrs. Schilling testified that appellant was W.C.'s primary caregiver. Both appellant and W.C. were living in the Schillings' home when W.C. was injured.

Mrs. Schilling recalled that the day before W.C. went to the hospital, appellant returned home from her waitressing job about 4:00 p.m. Upon arrival, appellant stated that she was leaving to visit her aunt. Mrs. Schilling told appellant to take W.C. and his sibling D.P. with her, noting that appellant "hadn't spent any time with them in about four days." Appellant took the children. When she came home at about 7:00 p.m., she was angry with Mr. Parker and went directly to her room, leaving him and Mrs. Schilling to bathe W.C. and D.P. and put them to bed. Mrs. Schilling testified that W.C. was fine when he went to bed at 8:00 p.m. The next time she saw him, he was in the emergency room.

When asked to identify the "adults who had access to W.C. at the time he was injured," Mrs. Schilling named only one person—appellant. Mrs. Schilling testified that by 6:00 a.m. the next morning her husband and her son had left for work. She had to arrive at work by

8

7:00 a.m., and when she left that day the only people still in the house were her nephew, Mr. Luedke, appellant, D.P., and W.C.  A few hours later, Mrs. Schilling received a call at work from appellant. She could hear that W.C. was "screaming really loudly" in the background, and she asked what was wrong with the baby.  Appellant said that he had a "soft spot" on the side of his head, and wanted to know what she should do.  From appellant's description, Mrs. Schilling thought that W.C. might have an ear infection, and she told appellant to take W.C. to the emergency room.

Later Mrs. Schilling received another call from appellant, this time asking Mrs. Schilling to "get to the emergency room as quick[ly] as possible because they were talking about child abuse."  W.C.'s hospital admission form, completed by appellant, stated that the reason for her child's admission was "head trauma," but she denied having any special concerns about it. Mrs. Schilling recalled that when she arrived at the hospital, appellant looked "not very upset."

On cross-examination, Mrs. Schilling denied that appellant ever said that she hit W.C., hurt him, or knew what happened to him.  She agreed that appellant always denied "doing it" and denied knowing how it had happened.  But when Mrs. Schilling spoke to a psychologist who was evaluating whether D.P. should remain in the Schillings' home after W.C.'s injury, she stated that she "strongly suspects" appellant reacted in a physically aggressive manner toward W.C., as appellant appeared to be the only person with him between the time that Mrs. Schilling left for work and the time that appellant discovered the "soft spot" on his head.

Mr. Schilling testified that he was at home on Sunday, the day before W.C.'s injury was discovered.  He denied hearing any unusual sound that night, but he acknowledged that he is a hard sleeper.  At about 4:30 on Monday morning, after he woke and made coffee, he saw

9

appellant walk into W.C.'s bedroom because one of the children "was kind of whining." He stated that appellant changed their diapers and returned to bed without saying anything to him. About twenty minutes later, Mr. Schilling and appellant's boyfriend left the house for work. Mr. Schilling denied knowing who injured W.C. But when he spoke to a psychologist who was evaluating the suitability of D.P.'s continued placement with the Schillings after W.C.'s injury, Mr. Schilling expressed his belief that appellant was responsible for W.C.'s injuries because she was his primary caretaker when the injuries occurred.

Mr. Luedke, Mrs. Schilling's disabled nephew, had been living in the garage of the Schillings' home for about two months and was also home on Sunday and Monday. He recalled that about 10:00 on Sunday morning, W.C. fell from the couch, got up, whined a little bit, and was comforted by appellant's boyfriend. Sometime before W.C.'s fall from the couch, appellant brought W.C. home from preschool with a "knot on his head," but Mr. Luedke stated that W.C. appeared to have recovered from that injury. On Monday, Mr. Luedke left the house at 7:00 a.m., went to an H.E.B. grocery store, and got a soda. When he returned, he noticed that the doors to appellant's room and the children's room were still shut. He went to the garage for a little while and then walked back inside to check the time. By then, the children were dressed and watching television. W.C. would usually sit in a recliner and rock while watching television, but this morning he was lying on the floor and looked like he did not feel well. Appellant was in her room with the door open, brushing her hair. Mr. Luedke said goodbye to the children and told appellant that he was leaving to donate plasma. When he left, W.C., D.P., and appellant were the only people in the house,

and W.C. was not injured. Mr. Luedke denied that there were any animals in the house besides a Chihuahua and two house cats.

On cross-examination, Luedke admitted that he does not have visitation with his children and that he had been investigated by Child Protective Services four or five years earlier based on his wife's and mother-in-law's accusations that he had molested his daughter. Mr. Luedke was not charged or arrested, and he passed three polygraph examinations. He stated that he offered to take a polygraph examination related to the incident involving W.C., but was told it would not be necessary.

Mr. Parker, appellant's boyfriend, testified that he did not know how W.C. was injured, no one ever told him how W.C. was injured, and appellant never told him that she hurt W.C. He knew that his cousin, Mr. Luedke, had been involved in a CPS investigation, but he stated that Mr. Luedke was not left alone with the children; an adult always supervised any contact Mr. Luedke had with them. However, when Mr. Parker was asked whether Mr. Luedke ever baby sat with the children, he acknowledged that Mr. Luedke had. On cross-examination, Mr. Parker further testified that Mr. Luedke knew the children, interacted with them, and "helped whenever we needed somebody to watch them for a few minutes." Mr. Parker agreed that sodas were kept in the Schillings' house. He thought that the nearest store was a Conoco, located a block and a half away, and that H.E.B. was eight or nine blocks from the house. He recalled that after W.C.'s injury, Mr. Luedke moved out of the Schillings' home and into his parents' home.

The medical evidence that W.C. sustained serious injuries was uncontroverted. Dr. Debbie Douty, a physician with over twenty-five years of experience and a pediatric intensive

11

care unit specialist, testified that an emergency room note showed W.C. was triaged on Monday morning at 9:30. He had an altered mental status, was sleepier than usual, and was not acting exactly like himself. Dr. Douty stated that W.C.'s CAT scan revealed a left skull fracture and a right parietal skull fracture with an underlying hematoma—which she described as a "collection of blood"—that was large enough to cause the brain to shift from the right to the left side and put pressure on the rest of the brain. Without immediate surgical intervention, W.C. was risking a vegetative state or death.

Dr. Douty denied that W.C.'s type of injury could be caused by falls from a bed or couch, or by a child throwing himself on the floor. His type of injury was caused by an acceleration of the head or the body followed by a sudden deceleration or stop into some fixed object. His injury was typical of what happens when a car stops suddenly in an accident and an unrestrained child in the back seat hits the front windshield, or a head-first fall from a second-story window. Dr. Douty testified that W.C.'s injury would have been so painful that there was a "very good chance he could have lost consciousness, at least for a while." She stated that he would not have acted like his normal self, and he would have cried or whined and become increasingly sleepy.

Dr. Douty denied that W.C.'s injury could have been caused a week earlier; based on the speed of the bleeding in W.C.'s brain and his level of consciousness, she thought that W.C.'s injury happened within a matter of hours, if not within the hour of his arrival at the hospital. She noted that the amount of bleeding, which started at the time of injury, was continuing to grow. "And that much push on the brain would have caused an increasing change in his level of alertness. . . . He was altered, but not totally unrousable. I believe that if it happened 12 hours before with that much [brain] shift, he would have been totally unrousable by that time." Once the bleeding was

12

seen, W.C. was taken immediately to the operating room because "it was already so big it was endangering vital structures that could cause permanent damage." Dr. Douty also noted that W.C. had a healing skull fracture that was easily distinguishable from these two new ones. While she could not know whether W.C.'s two new skull fractures happened at the same moment, "they were two fractures that had not been seen there on his last hospitalization, which was several months before." She added that when a patient has the type of trauma requiring the type of force that this required, and there is no story that fits the trauma, it is considered non-accidental.

On cross-examination, Dr. Douty acknowledged that skull fractures might not be accompanied by visible bruising until several hours later and that loss of consciousness might or might not occur, but a conscious child "would be screaming his brains out." She noted that appellant denied any kind of trauma, but she agreed that "if [appellant] had not witnessed the trauma, she would not have known what it was." Dr. Douty acknowledged that W.C. did not show signs of being shaken or held tightly, but did show signs of blunt-force trauma to his head.

Vicki Waddell, a Department caseworker, testified about appellant's failure to comply with parenting plan requirements. Waddell stated that she had "no idea" where appellant was because appellant had not maintained regular contact with the Department and all mail sent to appellant's last known address had been returned. Waddell further stated that appellant refused to take two drug tests requested by the Department because appellant believed it was "unfair" that her boyfriend did not have to be tested.[6] Waddell stated that W.C. was doing well in a foster-adopt

---

[6] Appellant eventually tested negative on a drug test administered by a separate entity.

home with his half sibling, D.C., and opined that appellant's parental rights should be terminated for engaging in conduct that endangered the physical and emotional well being of her child.

Waddell's report to the court was admitted into evidence. The report stated that appellant had not made any progress in alleviating the risk of abuse or neglect if the child was returned to her home. Appellant did not have a stable income, although she had recently started working. She was not participating in therapy.[7] She failed to maintain a stable living environment and her current residence was unknown; she told Department staff in Killeen that she was living out of her car. Her relationships were also unstable. She ended her relationship with Mr. Parker, stated that she was engaged to a man named Chris, and one month later stated that their relationship was over because he was a drug user. The report noted that appellant had been indicted for injury to a child and was awaiting trial.[8]

Also before the court was another report—prepared for the show-cause hearing by Department investigator Molly Rivers—that noted inconsistencies in the information provided by appellant. The report noted her conflicting accounts about when she first discovered a "soft spot" on W.C.'s head; she stated that she saw it at home while brushing his hair and that she noticed it while dropping him off at day care. She suggested that W.C. was injured when he fell at day care two weeks earlier and added that "[W.C.] throws fits where he throws himself on the floor." Day care center documentation, according to the report, showed that appellant was at the school between 8:45 and 9:00 on the morning that W.C.'s injury was discovered, and that during the preceding two

---

[7] Appellant requested a change of therapist, and when the Department scheduled an appointment with a new therapist, appellant did not attend the session.

[8] The resolution of appellant's criminal matter does not appear in the record.

weeks, W.C. had various red marks, scrapes, and bruises on his body when he came to class. However, the center had no incident report indicating that he had sustained any kind of head injury while at day care.

The report further stated that Ms. Rivers and Detective Larry Wilkey of the Temple Police Department interviewed the people who interacted extensively with W.C. between the Monday when his injury was discovered and the preceding Friday; none of those adults saw injuries of any kind to him. The report quoted a letter to the Department from Dr. Richard Bonner, a physician in the PICU who treated W.C., refuting appellant's suggestion about how W.C. was injured: "The fulminant (defined as "sudden, severe; occurring suddenly and with great intensity") presentation of [W.C.]'s subdural hematoma is not compatible with this injury having occurred a week prior to his presentation to the emergency room . . . . That inconsistency, combined with his history of previous suspicious injuries including skull fracture and humerus fracture, forces me to conclude that this is a non-accidental injury."

According to the report, when appellant was advised at the hospital of the Department's decision to remove W.C. from her care, she became verbally and physically abusive. She was cursing, stating that she was not "going through this again" and that Ms. Rivers would have to fight her and everyone in her household. She then attempted to enter the PICU, telling Ms. Rivers, who had been standing in front of the double doors to the PICU where W.C. was, to move out of the way. Detective Wilkey told appellant that could not be allowed, got her away from the door, and warned her to stop or risk arrest. Appellant tried to open the door again, cursed at Ms. Rivers, threw a punch at her that missed, and ultimately knocked Ms. Rivers away from the door by elbowing

15

her in the rib cage. Appellant was escorted away by Detective Wilkey, arrested, and charged with third-degree felony assault.[9]

When W.C. was discharged from the hospital, according to the report, he was "quite thin." Ms. Rivers noted that his weight had previously dropped below the weight-chart norm during the first month that he was reunited with appellant. She expressed concern that for about five years "the Department has offered [appellant] comprehensive and abundant casework services, parenting classes, [and] intensive individual and family therapy; none of which appears to have impacted her ability to properly care for her children." Just one month before W.C.'s injury, according to the report, the Department offered appellant in-home social services through Family Outreach, which she refused.

On appeal, appellant argues that this evidence shows "only one injury" to W.C. and because termination under subsection 161.001(1)(E) of the family code must be based on a voluntary, deliberate, and conscious course of conduct by the parent—not a single act or omission—no course of conduct has been shown to justify termination of her parental rights. *See In re M.N.G.*, 147 S.W.3d 521, 536 (Tex. App.—Fort Worth 2001, pet. denied) (op. on reh'g); *Parie v. Texas Dep't of Protective & Regulatory Servs.*, No. 03-03-00415-CV, 2004 Tex. App. LEXIS 5780, at *14-15 (Tex. App.—Austin 2004, no pet.) (mem. op.) (citing *Boyd*, 727 S.W.2d at 534, which held that although imprisonment alone was insufficient ground for termination, if evidence including imprisonment showed course of conduct that had effect of endangering child's physical

---

[9] The resolution of appellant's assault arrest does not appear in the record.

or emotional well-being, it would support endangerment finding). We disagree with appellant's view of this record.

Appellant's single-injury argument discounts W.C.'s prior skull fracture by stating that it "was ruled accidental by expert testimony in the previous cause" and that "a final order was entered by the Court in which the Department did not seek termination of appellant's rights." Neither of those assertions contain any reference to the record. *Cf.* Tex. R. App. P. 38.1(h). Nothing in this record shows any final court determination about the circumstances of W.C.'s earlier skull fracture. *See id.* Appellant offers no other argument for excluding W.C.'s prior skull fracture from the court's consideration of whether appellant had engaged in conduct that endangered W.C. It is undisputed that there was no witness, besides appellant, to W.C.'s fall down the stairs. Medical records show that the Department accompanied appellant to the hospital for evaluation of W.C.'s injury after that fall. According to those records, the doctors who treated W.C. doubted that his injury was accidental and would have considered a CPS consult, if the Department had not already been involved. The court also had a report from the Department noting that W.C.'s day care documented his various red marks, scrapes, and bruises when he arrived to class in the weeks before his most recent skull fractures.

Furthermore, when determining whether a parent engaged in an endangering course of conduct, courts are not limited to consideration of a child's physical injuries. *See In re S.H.A.*, 728 S.W.2d 73, 83-84 (Tex. App.—Dallas 1987, writ ref'd n.r.e.) (noting that termination of parental rights may be based solely on emotional endangerment); *see also In re T.H.*, No. 07-07-0391-CV, 2008 Tex. App. LEXIS 6107, at *21-22 (Tex. App.—Amarillo 2008, no pet.) (mem. op.) (holding

that failure to complete court-ordered service plan may be considered in determining whether parent engaged in endangering course of conduct). This record reflects, without dispute, that appellant refused Family Outreach in-home social services, failed to attend therapy, refused Department-administered drug testing (later undergoing testing elsewhere), and did not keep in contact with the Department. All of these requirements of the family service plan were designed to promote W.C.'s welfare while in her care.

There was some disputed evidence about whether W.C.'s most recent injury was caused by appellant's conduct. Appellant told the hospital and Department personnel that she did not know how W.C. was injured. However, the record lacks evidence showing that anyone besides appellant was responsible for W.C.'s injuries. She was his primary caregiver, although she avoided spending time with him for four days immediately preceding his injury. She entered W.C.'s room about 4:30 a.m. because one of the children was whining. Later that morning, W.C. began "screaming very intensely" after having a soft spot on his head touched with a brush, yet she still thought it was appropriate to take him to day care.

Appellant may not have told anyone that she hurt W.C., but she did not take him to the hospital—despite the unusual tenderness on his head and the intensity of his screams—until Mrs. Schilling directed her to take him. W.C.'s screaming, as described in this record by appellant and Mrs. Schilling, is consistent with Dr. Douty's testimony that a child with a skull fracture would be "screaming his brains out." In another call to Mrs. Schilling, this time from the emergency room, appellant told her to get there quickly—not because of the life-threatening nature of W.C.'s

injury—but "because they were talking about child abuse." When Mrs. Schilling arrived at the hospital, she recalled that appellant did not look very upset.

Appellant's explanation that W.C.'s injury was due to a previous fall at day care was discredited by Dr. Bonner as inconsistent with the medical evidence. Dr. Douty similarly ruled out suggestions that W.C.'s injury could have occurred two weeks earlier, because he remained in a conscious but altered state in the emergency room and based on the rapid rate of bleeding in his brain, she opined that W.C. was injured within a matter of hours, if not within the hour of his arrival at the hospital. The record shows that the last adults around W.C. before his arrival at the hospital were appellant and Mr. Luedke. Appellant was in the Schillings' home when Mr. Luedke was there, and she was with W.C. after Mr. Luedke left. The record does not reflect that she told hospital personnel or anyone else that she suspected Mr. Luedke might have injured her child or that he had any unusual interaction with W.C. before leaving the house.

Moreover, Mr. Luedke testified, but appellant avoided doing so by invoking her Fifth Amendment privilege against self-incrimination. As the factfinder in this civil case, the court was entitled to draw a negative inference from appellant's assertion of her Fifth Amendment privilege. *See In re C.J.F.*, 134 S.W.3d 343, 352-53 (Tex. App.—Amarillo 2003, pet. denied); *Kilpatrick-Lusk v. Texas Dep't of Family & Protective Servs.*, No. 03-05-00548-CV, 2006 Tex. App. LEXIS 10010, at * 5 (Tex. App.—Austin 2006, no pet.) (mem. op.); *see also Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976) (holding that Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them).

19

Having reviewed the entire record in a neutral light, we conclude that the evidence is sufficient to support the endangerment finding because it is such that the court as factfinder could have reasonably resolved any disputes in the evidence to form a firm belief or conviction that appellant engaged in conduct that endangered the physical and emotional well-being of her child, W.C. *See In re C.H.*, 89 S.W.3d at 18-19. We turn to the factual sufficiency of the evidence supporting the district court's finding that termination of appellant's parental rights was in W.C's best interest. *See id.* § 161.001(2); *In re C.H.*, 89 S.W.3d at 23.

**Factual sufficiency of best-interest finding**

Although appellant did not argue that termination of her parental rights was not in W.C.'s best interest, section 161.001 of the family code requires clear and convincing evidence that termination of parental rights is in the child's best interest. *See* Tex. Fam. Code Ann. § 161.001; *In re C.H.*, 89 S.W.3d at 23; *see also Williams v. Williams*, 150 S.W.3d 436, 451 (Tex. App.—Austin 2004, no pet.) (recognizing strong presumption that child's interest is best served by preserving conservatorship of parents, but holding that clear and convincing evidence to contrary may overcome that presumption). In deciding whether termination would be in the best interest of the child, the trial court may consider this nonexclusive list of factors: (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals to promote the best interest of the child; (6) the plans for the child by these individuals or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent which may

20

indicate that the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976); *In re D.G.*, 5 S.W.3d 769, 772 (Tex. App.—San Antonio 1999, no pet.).

It is unnecessary to prove all of these factors as a condition precedent to parental termination. *In re C.H.*, 89 S.W.3d at 27. Moreover, this Court has held that "a fact finder may infer that past conduct endangering the well being of a child may recur in the future if the child is returned to the parent." *Williams*, 150 S.W.3d at 451; *see In re J.S.*, No. 2-07-279-CV, 2008 Tex. App. LEXIS 4149, at *33-36 (Tex. App.—Fort Worth 2008, pet. denied) (mem. op.) (holding that it was in child's best interest to terminate mother's parental rights, considering factors such as severity of child's injuries, which included unexplained subdural hematoma and previous head injury; mother's failure to grasp severity of child's injuries; her claim that she did not know who caused her child's injuries; and her unlikely explanations for child's injury). This record shows that the *Holley* factors are met.

### Department's plans for the child and stability of proposed placement

Foster parent Zuthbeida Figueroa testified that she is employed as a nurse, married, and that she and her husband are foster parents to W.C.'s half sister, D.C. Ms. Figueroa stated that W.C. had been living in her home for several months and that he and D.C. got along well and were very attached to each other. She also stated that she and her husband want to adopt both children.

Caseworker Waddell's report noted that the foster parents had an existing relationship with W.C. because he had been placed in their home during a previous removal and that the foster parents have extensive experience and training in caring for children with needs similar to W.C.'s.

21

Ms. Waddell testified that it would be in W.C.'s best interest to terminate appellant's parental rights and allow the foster parents to adopt W.C. Appellant has not argued otherwise.

***Parental abilities of those seeking custody***

Mike Lockett, W.C.'s guardian ad litem, agreed with the Department's recommendation for termination of appellant's parental rights, noting that "the grounds are easily met" and that W.C.'s best interest was served because of appellant's instability. He stated that his recommendation for termination was "a sad comment for me to make, as hard as we have worked with this mother." Lockett noted that W.C. "has the opportunity to have a stable home" and a family that "can take care of him, now and in the future." Neale Potts, W.C.'s attorney ad litem, stated, "I agree with Mr. Lockett."

Appellant has a "considerable deficit in regard to parenting," in the opinion of her clinical psychologist, James Shinder. The Department's court report for the show-cause hearing stated that Dr. Shinder noted several areas of impairment, "some of which have significant implications." In his opinion, appellant's knowledge deficit, skill-development limitations, motivational problems, and the interference of her emotional problems would require intensive involvement in therapy. Her 98th percentile life-stress score was "extreme" and would likely be viewed as "incapacitating in regard to normative parental functioning." Appellant appeared "at a loss" for the appropriate resolution of various problems. When asked how she would try to calm an overactive child, she said that she would "take him to MHMR to get him some pills to fix it."

The Department was concerned about appellant's "lack of emotion" immediately following W.C.'s surgery and throughout one caseworker's contact with her. That emotional

22

disconnect is apparent from W.C.'s hospital-admission form, in which appellant noted that her child was admitted for "head trauma" but denied having any special concerns, and from Mrs. Schilling's testimony that when she arrived at the hospital, appellant did not look very upset.

Review of the record shows significant evidence indicating that a permanent home with the foster parents is in W.C.'s best interest. W.C. and his sister have lived with them, the children get along well together, and the foster parents intend to adopt both children. With the foster parents, W.C. has the companionship of a sibling who is bonded to him and a home that is stable.

Appellant's counsel conceded, "I can't argue best interest. . . . [R]ight now [W.C.]'s in a wonderful home. There's no question that they're going to be able to provide for him, that they're good parents, that they are providing him a stable home, that that's a great place for [W.C.] to be." She contrasted appellant's inability to "get to that level," noting that appellant had no home, no job, no family to live with, and a criminal case that remained pending. "Her life," counsel summarized, "is unstable."

Because the evidence in this record is such that the court could have formed a firm belief or conviction that termination of appellant's parental rights was in W.C.'s best interest, it is factually sufficient to support the court's finding and its decree. Appellant's sole issue is overruled.

## CONCLUSION

Having overruled appellant's sole issue, we affirm the district court's decree.

_____

W. Kenneth Law, Chief Justice

Before Chief Justice Law, Justices Puryear and Henson

Affirmed

Filed: December 31, 2008